CUNARD S. S. CO., Limited, et al. v. MELLON, Secretary of the Treasury, et al., and ten other cases.

(District Court, S. D. New York.   October 23, 1922.)

1. Intoxicating liquors ☞138—"Transportation" of liquor does not imply delivery to another.

"Transportation" of intoxicating liquor, made unlawful by National Prohibition Act, except as therein authorized, does not imply a delivery to another than the person who carries the liquor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Transport—Transportation.]

2. **Intoxicating liquors** ⬅️138—**Carriage on vessel in American waters held "transportation."**

The carriage of liquors on board a vessel entering American waters, though not intended for delivery within the United States, *held* "transportation" therein, within the meaning of National Prohibition Act.

3. **Intoxicating liquors** ⬅️138—**Bringing into port as part of ships' stores held "transportation" in violation of Prohibition Act.**

The bringing into ports of the United States of intoxicating liquors as part of ship's stores intended for sale to passengers for their consumption after the vessel has left the jurisdiction of the United States, though sealed while within the jurisdiction, *held* a transportation in violation of National Prohibition Act, tit. 2, § 3.

4. **Courts** ⬅️356—**Injunction pending appeal may be granted by federal court.**

On entry of final decree by a federal court dismissing a bill for injunction, the judge has power, under equity rule 74 (198 Fed. xxxix; 115 C. C. A. xxxix), in his discretion to grant an injunction pending an appeal.

In Equity. Suit by the Cunard Steamship Company, Limited, and the Anchor Line (Henderson Bros., Limited), against Andrew W. Mellon, Secretary of the Treasury of the United States and others, heard with ten other cases. On motions by defendants to dismiss bills, and by complainants for final decrees on the answers. Bills dismissed.

These cases come up upon motions by the defendants to dismiss the bills, and by the plaintiffs for final decrees upon the answers. The pleadings have been so drawn on both sides as to raise the merits of the controversy, and it is not necessary to set them forth in detail. The facts are these:

Since the enactment of the War Prohibition Act (Comp. St. Ann. Supp. 1919, §§ 3115¹¹/₁₂f–3115¹¹/₁₂h), in November, 1918, which was followed in January, 1920, by the Eighteenth Amendment and the National Prohibition Act (41 Stat. 305), it has been the continuous custom of all transatlantic passenger steamers to bring into the port of New York limited stocks of wines and liquors as part of their sea stores. This was done with the consent of the public authorities, who promulgated regulations recognizing the practice, but providing that, while within the territorial waters of the United States, they should remain intact under seal. The theory on which the authorities proceeded, acting on an opinion at that time given by the Attorney General, was that, as part of the ship's stores, these wines and liquors, if sealed and kept on board, were not to be regarded as brought within the country at all, or as subject to its municipal law, in accordance with the general rule that, as respects what happens upon the deck of a foreign ship, the municipal law does not apply, except in cases where the peace of the sovereign is at stake. Later the permission so given was further extended to allow the ships to dispense to their crews their customary ration of wine, as was in some cases required by the laws of the country from which they came.

This being the posture of affairs, on May 15, 1922, the Supreme Court decided in the cases of Grogan v. Walker, and Anchor Line v. Aldridge, 258 U. S. ——, 42 Sup. Ct. 423, 66 L. Ed. ——, that the bare transit of liquors across the territory of the United States was transportation within the Eighteenth Amendment. Thereafter the present Attorney General, after consideration, on October 5, 1922, rendered an opinion to the Secretary of the Treasury that these decisions covered passenger steamers plying in and out of the ports of this country. The President thereupon publicly announced that after a given date he should proceed to execute the law in accordance with this opinion, and this created the situation out of which these bills arise.

The practice of all steamers has been freely to sell wines and liquors out of these stocks to their passengers on east-bound voyages, when once outside the league limit, and to replenish them in Europe, so that they should suffice for a round trip. The stocks in question are therefore carried into the port, kept there under seal, and carried out again, only for the entertainment of

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

passengers embarking from the United States. Besides the wines and liquors so used, the steamers carry a stock for the use of their crews. In the case of the French, Italian, and Belgian ships, the law of their flag requires them to supply a ration of wine, and in those cases it is possible that the ships may not be able to obtain clearance unless they comply with this provision. Furthermore, the use of wines, beers, or liquors among the peoples, except Americans, from whom the crews of all the ships are drawn, is habitual, and these beverages are regarded as a necessary part of their ration.

Among the plaintiffs are two lines which sail under the American flag. These the authorities have always treated like the foreign lines; they have freely sold their wines and liquors at sea, and brought them into port under the same restrictions and with the same privileges as the rest. They are now, however, subject to the same proposed action by the defendants.

The defendants are not the same in all the suits. In some cases the Secretary of the Treasury is joined, in some the United States Attorney for the Southern District of New York, and in some the zone officer, but the collector of the port of New York and the local Prohibition Director are defendants in all.

Van Vechten Veeder, of New York City, for plaintiffs Oceanic Steam Nav. Co., Limited, Liverpool, Brazil & River Plate Steam Nav. Co., Limited, United S. S. Co. of Copenhagen, Royal Mail Steam Packet Co., Netherlands American S. S. Co. (Holland America Line), and Pacific Steam Nav. Co.

Lucius H. Beers, of New York City, for plaintiffs Cunard S. S. Co., Limited, and Anchor Line (Henderson Bros.).

Joseph P. Nolan, of New York City, for plaintiff Compagnie Générale Transatlantique.

Reid L. Carr, of New York City, for plaintiffs United American Lines and others.

Cleatus Keating and John M. Woolsey, both of New York City, for plaintiffs International Mercantile Marine and International Navigation Co., Limited.

William Hayward, U. S. Atty., and John Holley Clark, Jr., Asst. U. S. Atty., both of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). It is conceded, and indeed could not be disputed, after Grogan v. Walker and Anchor Line v. Aldridge, decided May 15, 1922, 258 U. S. ——, 42 Sup. Ct. 423, 66 L. Ed. ——, that, had the liquors here in question been a part of the ships' cargo, the bills would not lie. It makes no difference that they were not to be broached while carried within territory of the United States; the carriage would be transportation none the less. But because they are part of the ships' stores, in the sense that that term is generally understood, the plaintiffs argue that they do not fall within the same rule. This argument rests upon two alternative premises: First, that "transportation" involves a place where, and a person to whom, the goods are to be delivered; and, second, that a ship's stores have by long custom been treated as a part of the "furniture" (Brough v. Whitmore, 4 Term R. 206), or "appurtenances" (The Dundee, 1 Hagg. Adm. 109), of the ship which do not without particular mention become subject to the municipal law of the ports into which she enters, any more than the ship herself.

Even if "transportation" were defined to involve some delivery, I

do not see how that would help the plaintiffs. These liquors are carried for delivery at sea to the passengers and crew, and when so delivered their transportation ends. There appears to me no significant distinction in the fact that the place of delivery is the ship itself. The passengers, and, for that matter, the crew, are not the same person as the owner, and, if the passage of title or possession has anything to do with the matter the title to, and possession of, the bottle or the dram, passes when it is handed to its consumer. The carriage within the limits of the port of New York is a part of a transit whose purpose from the beginning is that very delivery. The fact that the place and the person are undefined is as irrelevant as it would be if a collier cleared to search out and coal at sea friendly cruisers during war, as happened in 1914.

[1] Therefore I might admit the plaintiffs' interpretation of the word, if it were necessary. Nevertheless it seems to me at best very doubtful whether it carries with it any such limitation. The cases on which the plaintiffs rely come only to this: That the jurisdiction of the United States under the interstate commerce clause does not terminate until delivery after a transit across state lines. Gloucester Ferry Co. v. Pa., 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Rhodes v. Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088; Louisville & Nashville R. R. v. F. W. Cook Brewing Co., 223 U. S. 70, 32 Sup. Ct. 189, 56 L. Ed. 355; Danciger v. Cooley, 248 U. S. 319, 39 Sup. Ct. 119, 63 L. Ed. 26. From this it does not follow that the term "transportation," as used in this statute, implies delivery to another than the person who carries the liquors. Suppose, for example, a parcel of liquor, made after the amendment, and carried off to be laid away in a cache. There can be no question, I believe, that two separate crimes would be committed, "manufacture" and "transportation."

[2] Nor does it seem to me that the thirteenth and fourteenth sections of title 2 of the Prohibition Act help the plaintiffs. Under these carriers are required to mark the consignor's and consignee's names on the outside of all packages. But it does not follow that a regulation like this of one kind of transportation imputes to the word itself any of the conditions which it enacts. In common use, to transport means to carry about, and I see no reason why it should mean less in section 3. The law clearly intended, by immobilizing liquor, to make surreptitious traffic in it impossible, and its policy would as well cover movements which might be incidental to, as those which immediately terminated in, a delivery to some one else. The case of Street v. Lincoln Safe Deposit Co., 254 U. S. 88, 41 Sup. Ct. 31, 65 L. Ed. 151, 10 A. L. R. 1548, did not decide anything to the contrary; it turned upon the fact that the possession of the liquor in the leased room and in the house were both lawful, and that the movement from one to the other could not be unlawful. To apply it to the cases at bar is to beg the question, because the lawfulness of the possession here depends upon whether this is transportation under the statute. The steamers have no express warrant of law, as Street had, for the possession of the liquor. I conclude, therefore, that the carriage in question is "transportation."

[3] The first point being thus disposed of, I come to the second. It is a very plausible argument to say that ship's stores ought not to fall within the general language of section 3; so plausible, indeed, that for three years it prevailed with the authorities charged with the enforcement of the statute. Their understanding is not to be ignored in interpreting the law itself, under well-settled canons. Since 1799 it has been recognized in the customs regulations of the United States (Revised Statutes, §§ 2795, 2796, 2797 [Comp. St. §§ 5492–5494]) that reasonable sea stores shall not be subject to duty. While they must be manifested, and may not be excessive in quantity, as such they are not regarded as entering into the commerce of the country. The plaintiffs say that, therefore, when section 3 of the National Prohibition Act forbade generally the transportation of liquors, it must be read in the light of this statute and the long usage under it, and that what is not within the United States for purposes of customs ought not to be so for purposes of prohibition. In addition, they urge that under the maritime law it is held that for most purposes sea stores will be treated as a part of the ship herself. If she is not regarded as being within the country, neither ought the accessories to her voyage.

It is, of course, true that one should not interpret a statute, and least of all a Constitution, with the text in one hand and a dictionary in the other, and so courts have often held in similar cases to these. Brown v. Duchesne, 19 How. 183, 15 L. Ed. 595; Taylor v. U. S., 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130; Scharrenberg v. Dollar Steamship Co., 245 U. S. 122, 38 Sup. Ct. 28, 62 L. Ed. 189. Nevertheless every one must agree that the question is no more than one of interpretation, for in the cases at bar Congress certainly might, if it chose, prevent the entrance of any liquor whatever within the borders of the United States, not only under the Eighteenth Amendment, but, indeed, under its power over foreign commerce. It is a question, therefore, of the implied limitations upon words which literally in any event cover the case.

Grogan v. Walker, supra, and Anchor Line v. Aldridge, supra, plainly meant to adopt a broad canon for the interpretation of the National Prohibition Act, following the admonition at the end of the first paragraph of section 3. Effecting a revolutionary reform in the habits of the nation, the statute is to be understood as thorough-going in its intent to accomplish the results desired. It did not specify the extent of its application in detail, but left that to be gathered from its occasion, and the generality of the words used. It intended to exercise once for all the complete power of Congress under the amendment, and its very want of particularity is a good index that it meant to cover what it could. For this reason it is to be distinguished from earlier local acts of the same kind, as, for example, the Alaskan Prohibition Act, upon the language of section 29 of which the plaintiffs rely. Indeed, specification in the statute might have defeated its ends, on the theory that what was omitted must be taken as excluded. At least I cannot read the two decisions cited without supposing that it was in the foregoing sense that the Supreme Court meant section 3 to be read.

Starting with that premise, there appears to me more reason for

supposing that section to cover these ship's stores than the transportation there before the court. I say this because it was necessary to overrule at least as much, if not more, to reach the result in those decisions, and especially because there were in them much stronger reasons to imply an exception from the literal language of the act. First, in those cases there was a statute which gave as much right of transit across the territory of the United States as here, and that statute had the support of a treaty negotiated only five years later, and assumed in the opinion of Mr. Justice Holmes to be still in force. Assuming that the customs laws give a positive right to enter ship's stores into the United States, a position in itself very doubtful, since in form it only exempted them from customs duties, at least it must be conceded that the statute, old as it is, represented only the policy, and not the promise, of the nation. It is true that the custom in maritime affairs is of long standing to treat such stores as a part of the ship; but, balancing that consideration with the implication against the repeal of a treaty, I cannot help believing that the second is the more weighty. At best it can only be said that the cases are on a parity in this regard.

However, the motives for positively assuming that such stores must be considered as included within section 3 appear to me stronger than any which could apply to a bare carriage across our territory. It is true that all such reasoning as to legislative motives is speculative, but that vice, if it be one, is of the plaintiffs' making, because the language of the statute, taken in its natural meaning, is general, and covers the case of stores, as of other merchandise. It is the plaintiffs who insist upon implying limitations on that meaning, because of the supposed intent of Congress. Since, therefore, I am asked to have recourse to implications, I cannot avoid some speculation as to what Congress would probably have said, had it been faced with the actual situation which now arises.

In the decisions cited there was no conceivable danger in the transit of liquor across the United States, except the chance of its escape. It is true that, as suggested in Grogan v. Walker, supra, the provision against export may have been intended to prevent the use of stimulants outside the United States, and, so far as it was, the argument applies with stronger force to the cases at bar. But, taken substantially, the only evil which the transit could accomplish was that some of the liquor should not complete its passage. In the cases at bar the danger of an escape is equally present, not perhaps in the case of these plaintiffs; but I cannot regard them alone. Less responsible owners may not be as scrupulous, and the law runs for all. The distinction which puts these cases within the law with much greater certainty is the purpose for which the liquors are brought and kept here. Ignoring for the moment the crews, all of the stocks are avowedly intended for the consumption of those who are now within the United States, of which a substantial part are residents or citizens, the very persons whom it was the whole purpose of the amendment to prevent drinking liquors.

Naturally I have nothing to say about the wisdom of the amendment or the law; but, wise or not, one thing is clear: That a drink of whisky is as hurtful to health and morals outside as inside Ambrose Light.

It appears to me inconceivable, when one is discussing the implied intent of Congress, that a statute cast in such sweeping terms should be read as indifferent to open preparations within the United States for the gratification by its citizens of exactly those appetites which it was the avowed intent of the statute altogether to deny. Nor do I believe that any one would hesitate to think so who did not already repudiate the whole reform. If, for example, we were to substitute cocaine or opium for alcohol, I can scarcely think there could be any disinterested difference of opinion. Suppose it were the habit of Chinese vessels to bring to our ports among their stores a proper supply of morphine and opium, with the avowed purpose of dispensing it freely to passengers from the United States as soon as they cleared the league limit. Could it be seriously argued that a constitutional amendment and a statute in broad language designed to prevent citizens from using this drug did not cover so palpable a means of nullifying the very purpose of the law? The illustration is extreme only to those who can see no parity between the evils of opium and alcohol. But a judge cannot take any position on that question; it must be enough for him that each is forbidden.

It is indeed different with so much of the stocks as are kept for the crews, and a much stronger argument can be made for the legality of their carriage, though these also seem to me to fall within the decisions I have so often cited. However, that question is really irrelevant as these cases are presented. The plaintiffs base their argument on the improbability that a statute in such general words should have meant to cover sea stores. This in turn rests upon the unlikelihood that what has been for so long treated as not subject to municipal law should all at once become so. But the argument breaks down as soon as it appears that the stores as a whole cannot fairly be excluded. To say that the section covered some of such stores, but not all, would be to admit that as such they were not excluded by implication. What, then, becomes of the argument? There are indeed cogent reasons why these might be excepted, but these are not because they are ships' stores. Congress may indeed determine to make an exception in their favor, as to the validity of which I have nothing to say; but I do not think that a judge can imply the exception because of the unquestioned difficulties in which its absence leaves the plaintiffs. There is a narrow limit to judicial redrafting of statutes. Indeed, the argument was not suggested at the bar that passengers' refreshment and crews' rations stood in different positions. Probably none was intended, and I mention it only against the possibility that it might be taken later.

Cases like Brown v. Duchesne, supra, Taylor v. U. S., supra, and Scharrenberg v. U. S., supra, are all indeed in point. They illustrate the extent to which seamen and ships are regarded as enclaves from the municipal law. But they were all judicial exceptions by implication out of the words of a statute, and they therefore depended upon how far, in the circumstances of each case, it was improbable that "the natural meaning of the words expressed an altogether probable intent." Were it not for the declaration of the Supreme Court, in what I regard as far weaker circumstances, that the literal meaning of section

3 accords with the probable intent, they might embarrass my conclusion. As it is, they do not, for in such matters each case is sui generis, and I have only to follow any decision which is apt to the statute under consideration. For these reasons I hold that the threatened action of the defendants is legal, and that the bills must be dismissed.

It is obvious that this ruling disposes of the cases of the American ships, as well as of the foreign. The American bills contain no allegations that the defendants intend to prosecute them for the sale of liquors upon the high seas, as, for example, on westward voyages. It is true that the prayers for relief do include so much, but prayers without allegations are ineffective. I do not, therefore, find it necessary to consider the legality of any sales of liquor under the American flag on the high seas, assuming no liquor is brought within our territorial limits. It was my understanding at the argument that the territoriality of an American ship at sea was discussed only in case I should hold that it was not illegal merely to carry liquors into and out of the port.

[4] I suppose that the question of a temporary restraining order pending the appeal is of a good deal more consequence to the plaintiffs than anything I may think about the law. The power under the seventy-fourth rule (198 Fed. xxxix, 115 C. C. A. xxxix) to grant such an order is undoubted, notwithstanding a dismissal of the bill. Merrimac River Savings Bank v. City of Clay Center, 219 U. S. 527, 31 Sup. Ct. 295, 55 L. Ed. 320, Ann. Cas. 1912D, 513; Staffords v. King, 90 Fed. 136, 32 C. C. A. 536. Moreover, the whole thing rests in the discretion of the trial judge. The question is how far the absence of any protection to the losing party will expose him to serious and irreparable damage, if in the end he wins, without imposing an equal damage upon the other party, if he holds his decree. Like all such matters, it depends upon a balance between the two, and I must now assume that the chances of success are not equal.

On the one hand, the plaintiffs are in unquestionable embarrassment. They must take off their stocks of liquor now in port, and if they bring any westward with them they must calculate with some nicety on the consuming capacities of their passengers or take the chances of a seizure of the residue in New York. Nevertheless, so far as the loss of the liquors themselves is concerned, the damage cannot be said to be irreparable. These must be condemned before they can be forfeited, and in the present state of the calendars the cases at bar will be finally determined long before such libels can be tried. If I am wrong, the plaintiffs will get back their property after a delay which I cannot regard as an irreparable damage. If I am right, it would be obviously improper, by staying the defendants, to allow the liquor to escape a seizure to which the United States is entitled under its laws. With the conduct of any such proceedings I have nothing to do. It may be that the long acquiescence of the authorities in the practices here in question will moderate the ultimate penalty of confiscation. I must assume that the plaintiffs will receive such consideration as the law permits, but I ought not to protect them against proceedings to which they by hypothesis would be legally subject.

However, I do not understand that they are so much concerned over

the possible loss of existing stocks as over the right meanwhile to carry them in and out as a means of selling them at sea and serving them as part of the crew's ration. If the ration is cut off, some in any case of the plaintiffs will be in a serious dilemma between two conflicting laws. The others will probably have a good deal of trouble and expense in securing seamen who will sign on upon a "dry" ship. On the other hand, foreign crews are scarcely within the dominant purpose of the Eighteenth Amendment. It appears to me just, on a fair balance of the relative advantages, to stay the enforcement of the law against stocks of wine and liquor necessary for crews' rations, if honestly kept and dispensed for that purpose alone.

As to the maintenance of passengers' stocks the case is otherwise. The plaintiffs are all upon the same competitive footing inter se, and only claim to fear the competition of Canadian lines. How serious that may be no one can tell, but certainly it will be felt much less during the next two or three months than at another season. In any event, on the balance of advantage I ought not to allow it. It is easy to say, if one does not take seriously the opinion behind the amendment, that the United States will not suffer by the continuance of the status quo. But it is impossible to say so, if one does. I repeat what I said in Dryfoos v. Edwards, 284 Fed. 596, filed October 10, 1919, on a similar occasion. The suspension of a law of the United States, especially a law in execution of a constitutional amendment, is of itself an irreparable injury, which no judge has the right to ignore. The public purposes, which the law was intended to execute, have behind them the deep convictions of thousands of persons whose will should not be thwarted in what they conceive to be for the public good. No reparation is possible, if it is.

Furthermore, it is at best a delicate matter for a judge to tie the hands of other public officers in the execution of their duties as they understand them, and the books are full of admonitions against doing so, except in a very clear case. Here not only is the case not clear, but, so far as I can judge, the plaintiffs have no case. Therefore I will go no further than to issue an injunction against interfering with the carriage of a stock necessary for the crews' rations on the east-bound voyage. The plaintiffs must each give a bond in the sum of $25,000, conditional against the use of such stocks for any other purpose than as crews' rations.

Bill dismissed, with costs; injunctions as indicated pending an appeal, if the same be taken at once. Settle orders on notice.