## AMTORG TRADING CORPORATION v. HIGGINS, Collector of Internal Revenue.

District Court, S. D. New York.

Oct. 26, 1944.

David Drucker, of New York City (Paul O'Dwyer, of New York City, of counsel), for plaintiff.

James B. M. McNally, U. S. Atty., of New York City (John B. Creegan, Asst. U. S. Atty., of New York City, of counsel), for defendant.

ABRUZZO, District Judge.

In this action at law the plaintiff, the Amtorg Trading Corporation, seeks recovery from the Collector of Internal Revenue, Third District of New York, of the sum of $85,227.91, plus interest, assessed and paid under Section 612 of the Revenue Act of 1932, as amended, 26 U.S.C.A. Int. Rev.Acts, page 613, this sum representing excise taxes paid in connection with the sale of matches.

Statute and Regulations Involved.

Section 612 of the Revenue Act of 1932, c. 209, 47 Stat. 169, 264, as amended by Section 611 of the Revenue Act of 1934, c. 277, 48 Stat. 768, provides:

"Sec. 612. Tax on Matches

"There is hereby imposed upon matches sold by the manufacturer, producer, or importer, a tax of 2 cents per 1,000 matches, except that in the case of paper matches in books the tax shall be $\frac{1}{2}$ of 1 cent per 1,000 matches, and except that in the case of fancy wooden matches and wooden matches having a stained, dyed, or colored stick or stem, packed in boxes or in bulk, the tax shall be 5 cents per one thousand matches."

Treasury Regulations 44, promulgated under the Revenue Act of 1932, provides:

"Art. 1. Definitions.—

"(j) Sale means an agreement whereby the seller transfers the property (that is, the title or the substantial incidents of ownership) in goods to the buyer for a consideration called the price, which may consist of money, services, or other goods."

"Art. 4. When tax attaches.—In the case of a sale (other than an installment or conditional sale) the tax attaches at the instant the sale is made. The time when a sale is made is determined by several rules of law, among the more important of which are: (1) When there is a contract to sell unascertained articles, no property in the articles is transferred to the buyer until the articles are ascertained; (2) when there is a contract to sell specific or ascertained articles, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred; and (3) for the purpose of ascertaining the intention of the parties regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case. * * * *"

Facts

The plaintiff, the Amtorg Trading Corporation, incorporated under the laws of the State of New York, entered into an agreement with the Northam Trading Corporation, incorporated under the laws of the State of New York, on March 28, 1934. By virtue of this agreement, Amtorg was to deliver to Northam matches in an amount not in excess of 1,500,000 gross within a period of ten months.

There was a gross price fixed in this agreement, f. o. b. Leningrad or, if Northam desired shipments from Hamburg, f. o. b. the vessel at Hamburg.

The agreement further provided that the matches were to bear special labels of Northam or customers named by Northam.

In addition to the agreed price provided for in the agreement under various conditions, all duty, excise taxes, freight landing charges, storage, or any other charges that might accrue after the merchandise was placed alongside of dock in the United States, were to be for Northam's account, and under certain conditions storage charges were to be for Amtorg's account.

There were many other provisions relating to this agreement that for the purpose of this opinion need not be alluded to or necessary to relate at great length. Most of the facts were stipulated and the agreement is in evidence, Exhibit No. 1A.

By virtue of the agreement, matches began to arrive in New York on May 21, 1934, up to and including November 30, 1934, in the total of some 16 shipments.

One shipment arrived in Philadelphia in December and one in Baltimore in July.

The Government contends that there are three issues presented: (1) Whether the Amtorg Trading Corporation is the importer of the matches on which excise taxes were paid; (2) whether the matches were sold by Amtorg to Northam after importation; and (3) whether Amtorg is entitled to a credit for excise taxes paid by Northam.

Plaintiff claims that the sale was consummated abroad and the title to the matches was in Northam at the time of their arrival in the United States, and that Northam was the importer and not the plaintiff in the sense contemplated by the statute.

It seems it will be necessary, therefore, at this time to allude more in detail to the facts in order to determine what bearing they have on the issues presented. Some of the undisputed facts may be briefly summarized as follows:

In 1934, Northam was engaged in business as an importer and jobber of foreign merchandise. The plaintiff sold articles of Soviet manufacture, and another corporation closely affiliated with the plaintiff, the Am-Derutra Transport Corporation, was the forwarding agent engaged in handling Soviet importations through United States Customs.

On March 28, 1934, Northam purchased for importation into the United States one and a half million gross of safety matches to be manufactured in the Soviet Union under a contract with the plaintiff bearing that date, the delivery of these matches to be in monthly instalments, f. o. b. Leningrad, or, at the option of Northam, f. o. b. Hamburg.

The matches were to bear the label and trade-mark of Northam or its designated customers.

The agreement expressly provided that all duty, excise tax, freight, landing charges, storage and all other charges that might accrue after the merchandise was placed alongside the dock would be for Northam's account.

The first delivery under this agreement was made aboard a vessel in the Soviet Union on March 31, 1934, consisting of 8,-409 cases. The bill of lading was drawn to the order of the plaintiff, Amtorg, who endorsed it to the order of Am-Derutra.

After the goods arrived in the United States, Am-Derutra released to Northam 6,669 cases and Northam paid the duty on them. The remaining 1,740 cases were stored in a bonded warehouse in the name of Am-Derutra. Between June 8 and July 27, 1934, these 1,740 cases were withdrawn by Northam.

Upon arrival of this first shipment, Amtorg issued to Northam invoices covering the entire first shipment, and on the face thereof there was a statement that terms were as per agreement, price per gross, f. o. b. Soviet Port, Ocean Freight, Duty, Excise for Account of Buyer.

All of the matches involved in this action were entered through the Customs by Am-Derutra under its bond to the Collector of Customs guaranteeing the payment of duty. The matches were withdrawn from Customs' custody by Northam through its own customs broker who prepared all the necessary customs withdrawal documents, procured Am-Derutra's signature to these documents, and on release of the matches they were delivered to Northam. All storage charges were paid by Northam directly to the storage warehouse.

Northam made and filed monthly reports required by the Internal Revenue Department to be filed by manufacturers, producers, or importers of matches, showing sales made by Northam during the previous month. Northam paid the excise tax on these sales. These reports were made regularly during the months of June to December, 1934, and Northam paid a tax on matches sold by it during these months in the sum of $31,815.98. In November, 1934, Northam, in reply to an inquiry by the plaintiff, forwarded its statement showing its payments of the excise taxes on sales of matches under the above contract, and this statement indicated the payments of such taxes for the months of July, August, and September, 1934, of $4,046.76, $8,276.-52, and $12,785.04, respectively. The official tax returns made by Northam verify these payments.

After Northam took all of the matches in the first four shipments, Northam became irregular in its payments, so that on December 10, 1934, Amtorg terminated its agreement with Northam because of these defaults. Amtorg thereupon repossessed itself of the matches not paid for, and sold them. Amtorg paid the excise tax in full on these matches and they are not involved in this litigation.

The tax involved in this action is the one imposed on Amtorg with respect to the matches delivered to and taken by Northam. There were 18 shipments involved, commencing May 21, 1934, and ending December 8, 1934, on various vessels from various ports. The shipments were all either from Leningrad or Hamburg to New York, one shipment to Philadelphia, and one to Baltimore. All of the shipments except one contained a declaration of nominal consignee to the effect that Amtorg Trading Corporation was the actual owner or ultimate consignee.

With all of these warehouse entries there was filed a bill of lading to the order of the Amtorg Trading Corporation, with an endorsement directing delivery to the Am-Derutra Transport Corporation. The endorsement on the bill of lading to the Am-Derutra Transport Corporation was signed by the Amtorg Trading Corporation. The only exception to these 18 shipments was the Baltimore one. There the entry was to the order of the Am-Derutra Transport Corporation and the bill of lading was also to the Am-Derutra Transport Corporation, to be forwarded to Baltimore for Amtorg, New York. The cases in every instance were marked Amtorg, New York.

The pro-forma invoice of Amtorg, New York, was filed and stated:

Purchaser: Amtorg Trading Corp., 261 Fifth Ave., New York City.

Seller: Mineralsilicatexport, Moscow, U. S.S.R.

Merchandise: Safety matches

Produced in the city of: Tchupovo, U.S. S.R.

The Baltimore shipment had no such pro-forma invoice. The price was indicated in these pro-forma invoices as f. o. b. Soviet port.

Each shipment had a separate entry number, and with entry No. 57673 a declaration of purchase was filed which indicated that the Amtorg Trading Corporation was the owner of the merchandise covered in that particular entry.

A consular invoice was filed with entry No. 63516, New York, signed by Amtorg, Russian branch, which stated that the safety matches were purchased by Amtorg, New York, under an agreement of March, 1935. The ocean freight on the matches covered by the various entries was first paid by Am-Derutra Transport Corporation who in turn charged Amtorg, and they in turn charged Northam on the merchandise withdrawn from the warehouse and which charges Northam paid. On all the entries made at the Port of New York, R. F. Downing & Co., Inc., of New York City, acted as customs broker and billed the Am-Derutra Transport Corporation, and the Am-Derutra Transport Corporation billed Amtorg who in turn invoiced Northam. The warehouse charges on matches withdrawn from the warehouse by Northam were paid by Northam, and it must be borne in mind that the release from the warehouse must be distinguished from the release from Customs' custody. From the warehouse Northam, through its customs broker, prepared customs form known and entitled "Duty paid warehouse withdrawal for consumption form," which was presented to the customs broker for Am-Derutra. This customs broker signed it on behalf of Am-Derutra, returning the same to the customs broker representing Northam who then presented this form to the Collector of Customs. Northam thereupon paid the duty on the merchandise to be withdrawn directly to the Collector of Customs who thereupon issued a permit for the release of these matches from Customs' custody. Matches were stored in two bonded warehouses, the Long Dock and Harborside. The records of the Long Dock were destroyed by fire and are unavailable. The matches stored in the Harborside were in the name of Amtorg and were released only on order of Amtorg both before December 10, 1934, and thereafter.

It developed that after December 10, 1934, Amtorg sold to others the matches that were in the warehouses which Amtorg claimed belonged to Northam. These matches were released from Customs' custody on the order of Amtorg. On June 28, 1937, the Commissioner of Internal Revenue assessed against Amtorg, under Section 612 of the Revenue Act of 1932, as amended, excise taxes in connection with the matches imported by Amtorg and delivered to Northam. The original assessment was apparently wrong and, on October 20, 1940, there was paid by the plaintiff the sum of $60,432.92, and with computed interest of $24,794.99, making a total of $85,227.91.

On November 17, 1942, Amtorg filed a claim for refund which was rejected on

March 24, 1943. This complaint and action subsequently followed.

The first issue that must be determined is whether Amtorg was the importer of the matches on which the tax was paid, or whether title passed under the so-called written agreement to Northam at Leningrad or Hamburg. Unless title to these matches passed to Northam at Leningrad or Hamburg the tax was properly assessed by the Government against Amtorg and Amtorg would not be entitled to any refund.

The language of Treasury Regulations 44, Article 4, must be interpreted, it seems to me, before the proper conclusion might be arrived at. Subdivision (2) of that article contains the following language:

"(2) when there is a contract to sell specific or ascertained articles, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred;"

Subdivision (3) reads as follows:

"(3) for the purpose of ascertaining the intention of the parties regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case. * * *"

Undoubtedly, when the agreement and contract was first entered into, the parties intended to come within the language of subdivision (2). I have no doubt that title pursuant to that agreement was intended to pass in Hamburg or Leningrad at that time. The agreement was not carried out in this respect, and I firmly believe that this action comes under the purview of the language of subdivision (3) in this respect. An analysis of the agreement must be made not only pursuant to the written terms of the contract but the conduct of the parties following the signing of the agreement and the circumstances of the case. We find that for the first delivery on March 31, 1934, consisting of 8,490 cases, the bill of lading was drawn to the order of the plaintiff, Amtorg, who in turn endorsed it to the order of Am-Derutra. Between June 8 and July 27, 1934, 1,740 of the cases were released to Northam, and upon the arrival of this first shipment Amtorg issued to Northam invoices covering the entire first shipment. All of the matches involved in this action, including that particular shipment, were entered through the Customs by Am-Derutra under its bond to the Collector of Customs, guaranteeing the payment of duty. Northam was only able to obtain custody of these goods after Amtorg and Am-Derutra released the matches to them.

On December 10, 1934, after Northam became irregular in its payments, the agreement was terminated by Amtorg because of defaults. Amtorg repossessed itself of the matches not paid for and sold them. The tax paid by Amtorg on these particular matches is not involved in this litigation, but this salient feature is alluded to because of the fact that Amtorg's actions indicated that they regarded the title in the matches in them and sold them on that assumption.

It is further conceded that the shipments all contained a declaration that Amtorg Trading Corporation was the actual owner or ultimate consignee. A pro-forma invoice of Amtorg, New York, was filed and stated: "Purchaser Amtorg Trading Corporation, 261 Fifth Ave., New York City." The Government was, therefore, justified in concluding from this invoice properly filed that Amtorg Trading Corporation was the purchaser. It could not know and did not know of the private agreement between the Russian Government and Northam upon which this action is based.

Consular invoice with entry No. 63516 stated that the safety matches were purchased by Amtorg, New York, under an agreement of March, 1935, while the agreement put at issue with Northam was dated March 28, 1934. The customs broker acting for Am-Derutra billed the Am-Derutra Transport Corporation who in turn billed Amtorg, and they in turn billed Northam.

The matches were stored in two bonded warehouses and, while the records of one were destroyed by fire and not available, the records of the other warehouse indicated that they were stored in the name of Amtorg and could only be released by its order. While it is true Northam had an agreement in writing for these matches, f. o. b. Leningrad or Hamburg, the matches were never shipped or dispatched f. o. b. Leningrad or Hamburg but were in fact shipped to Amtorg as the purchaser. The agreement, therefore, was never actually carried out and the circumstances of the case are strongly indicative of the finding that Amtorg was the real purchaser and not Northam, or at least Amtorg was the importer.

I suspect in the light of the facts proven that the matches were not delivered to Northam until he paid for them and payment was not forthcoming from Northam until the matches arrived here and were released by Amtorg. To substantiate the written agreement between Northam and the Russian Government, it seems to me the proof would have to show that the goods in question were put on board the vessel at Hamburg or Leningrad, f. o. b., in the name of Northam and not Amtorg. This would of necessity be so in order to transfer title to Northam at the shipping point. Amtorg or Am-Derutra never considered title to the matches passed to Northam at that point, in the light of its action, to wit, the invoice contained the name of Amtorg as purchaser, matches stored in the warehouses were in the name of Amtorg, none of the goods could be released without an order from Amtorg, and when there was a breach of the agreement on December 10th, as claimed by Amtorg, Amtorg then sold the matches for its own account and not for the account of Northam.

■ If this action were as between Amtorg and Northam, the contention raised by Amtorg that title passed at Leningrad or Hamburg might well be substantiated. The cases cited by Amtorg might be applicable to that holding. Based upon the facts before me, it seems it would be a strained interpretation to make that finding as between Amtorg and the Government. The facts before me are indicative of a finding that for tax purposes title in the United States was held by Amtorg. The presumption of title which Amtorg claims under the agreement is not conclusive and may well be vitiated by the actions of the parties thereto.

■ In Meredith and Ellicott v. United States, 1839, 13 Pet. 486, 494, 10 L.Ed. 258, it was held that importation is complete when the goods have arrived within a designated port with the intention to unload. The person to whom the goods are addressed and designated is the title holder. See also Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A. L.R. 1306. The same interpretation should be accorded the agreement as that adopted in practice by Amtorg and Northam. Carthage T. P. Mills v. Vil. of Carthage, 1910, 200 N.Y. 1, 14, 93 N.E. 60.

As was aptly said in Pottash v. Cleveland-Akron Bag Co., 1st Dept. 1921, 197 App.Div. 763 at page 769, 189 N.Y.S. 375, at page 379, affirmed without opinion, 235 N.Y. 520, 139 N.E. 717:

"Had the goods been delivered to the carrier, and a straight bill of lading received, or a bill of lading to the order of the buyer, then the delivery to the carrier would have been a delivery to the buyer. But where, as in this case, the goods are consigned to the seller, and the bill is issued to the seller's order, title or right to possession does not pass to the buyer, but remains in the seller. * * *"

■ It is my firm opinion that title passed to Northam at the moment the matches were paid for, to wit, somewhere in the United States, and if Northam had not paid for the matches they would never have been delivered to them here.

As to the second point involved in this litigation, to wit, whether Amtorg is entitled to a credit for excise taxes paid by Northam to the United States Government, it will be necessary to refer to some extent to the testimony in evidence with respect to this phase of the case.

Paragraph 31 of the stipulated facts concedes that between June, 1932, and April, 1935, the Northam Trading Corporation paid to the Collector of Internal Revenue the sum of $116,405.22 as excise taxes on safety matches under Section 612 of the Revenue Act of 1932, as amended.

Paragraph 34 contains a concession that excise taxes in the sum of $739.88 and interest in the sum of $490 were paid by the plaintiff on the sale of matches which were exported from the United States by Northam Trading Corporation for which Amtorg claims credit.

Paragraph 37 concedes that Exhibit "1T" is a schedule of the invoices issued by Amtorg Trading Corporation to Northam Trading Corporation covering the matches upon the sale of which the excise tax sought to be recovered in this action has been assessed.

■ It is academic, of course, that Congress did not intend to levy an excise tax more than once, and, in the event that the plaintiff is liable for the excise tax as I have so held, it should nevertheless be credited with all payments made by its vendee (Northam) on account of the excise tax paid on the importation and sale of the matches in question.

■ The burden of proof is on the plaintiff, Amtorg, to show that the excise taxes were paid by Northam on sales from Amtorg to Northam or sales by Northam to others of Amtorg matches.

In addition to the stipulated facts referred to in this opinion, Amtorg relies upon plaintiff's Exhibits 4, 5, and 6 to establish its right to this credit.

Exhibit 6 is a letter dated November 17, 1934, written by Amtorg to Northam requesting a statement of excise taxes paid by Northam on Amtorg matches.

Exhibit 5 is a statement dated November 20, 1934, by Northam to Amtorg stating that excise taxes of $4,046.76, $8,267.52, and $12,785.54 were paid by Northam as excise taxes on matches bought from Amtorg.

The agreement at issue provided that Northam would sell only matches purchased from the Soviet Government. Northam was a jobber and these matches in question were manufactured for Northam by a foreign manufacturer. Plaintiff contends that Treasury Regulations 44 which specifically excludes the importer or manufacturer from liability for the tax and places such liability directly upon the jobber must be taken into consideration to some extent as bearing on the intention of the parties.

It is unfortunate that the books and records of the Northam Trading Corporation were not available in Court through no fault or lack of effort on the part of the plaintiff to have them so produced.

The witness, Goldstein, who was produced, came on the compulsion of a subpoena and was, to say the least, a very reluctant witness. He was an officer of Northam. He did at least testify that he believed the payments amounting to $25,099.82 were payments made on account of matches purchased from the plaintiff. Plaintiff's Exhibits 4, 5, and 6 read together are indicative of the conclusion that Northam paid excise taxes on matches bought from Amtorg. The Government conceded that Northam filed returns and paid excise taxes on matches but claims that the returns filed by Northam did not indicate what sales of matches were covered.

There is no dispute, it seems to me, by the Government that Northam paid excise taxes on matches, one payment of $4,046.76, another payment of $8,267.52, and the $12,785.54, during the period that the agreement was in force and deliveries were made by Amtorg to Northam of matches.

Exhibit 5, the statement by Northam to Amtorg setting forth these particularized payments, coincides with the Government records of receipt. This is significant and all of the evidence leads to the conclusion that these three amounts of excise taxes were paid by Northam on matches bought from Amtorg.

■ Therefore, payments of excise taxes paid by Northam of $25,099.82 between the dates of March 28, 1934, and December 10, 1934, the period during which the contract was in force and effect, must be given as credit to the plaintiff.

It is conceded by the Government that there were returns filed by the Northam Trading Corporation in the sum of $32,749.30 during the period that this agreement was apparently in force, to wit, March 28, 1934, to December 10, 1934. They did not concede that this amount was paid on matches imported by Amtorg. There was no direct proof by the plaintiff that this total amount was paid by Northam on importations by Amtorg. The plaintiff sought to have me draw an inference that because this amount was paid by Northam they were, therefore, entitled to this credit. This I cannot do in view of Paragraph 31 of the stipulated facts which concedes that between June, 1932, and April, 1935, the Northam Trading Corporation paid to the Collector of Internal Revenue the sum of $116,405.22 as excise taxes on safety matches.

It will thus be noted that excise taxes were paid on matches by Northam other than those imported by Amtorg. I could just as easily draw the inference that part of the $32,749.30 or that part beyond the $25,099.82 which I am allowing might have been paid by Northam on matches other than those imported by Amtorg.

I, therefore, cannot indulge in the inference the plaintiff seeks me to draw, nor can I say the plaintiff has sustained the burden cast upon it as to the $7,649.48. A judgment can only be entered for the plaintiff in the sum of $25,099.82.

Submit findings of fact, conclusions of law, and judgment in accordance with this decision.