CUNARD STEAMSHIP COMPANY, LTD., ET AL.
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

OCEANIC STEAM NAVIGATION COMPANY, LTD.,
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

INTERNATIONAL NAVIGATION COMPANY, LTD.,
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

COMPAGNIE GENERALE TRANSATLANTIQUE
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

NETHERLANDS - AMERICAN STEAM NAVIGA-
TION COMPANY (HOLLAND AMERICA LINE)
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

LIVERPOOL, BRAZIL & RIVER PLATE STEAM
NAVIGATION COMPANY, LTD., *v.* MELLON,
SECRETARY OF THE TREASURY, ET AL.

ROYAL MAIL STEAM PACKET COMPANY *v.* MEL-
LON, SECRETARY OF THE TREASURY, ET AL.

UNITED STEAMSHIP COMPANY OF COPEN-
HAGEN (SCANDINAVIAN AMERICAN LINE)
*v.* MELLON, SECRETARY OF THE TREASURY,
ET AL.

PACIFIC STEAM NAVIGATION COMPANY *v.* MEL-
LON, SECRETARY OF THE TREASURY, ET AL.

NAVIGAZIONE GENERALE ITALIANA *v.* MELLON,
SECRETARY OF THE TREASURY, ET AL.

INTERNATIONAL MERCANTILE MARINE COM-
PANY *v.* STUART, ACTING COLLECTOR OF CUS-
TOMS FOR THE PORT OF NEW YORK, ET AL.

UNITED AMERICAN LINES, INC., ET AL. *v.*
STUART, ACTING COLLECTOR OF CUSTOMS
FOR THE PORT OF NEW YORK, ET AL.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 659–662, 666–670, 678, 693, 694.   Argued January 4, 5, 1923.—
Decided April 30, 1923.

1. The words " transportation " and " importation," in the Eighteenth
   Amendment, are to be taken in their ordinary sense, the former
   comprehending any real carrying about or from one place to
   another, and the latter any actual bringing into the country from
   the outside.   P. 121.
2. The word " territory," in the Amendment (in the phrase " the
   United States and all territory subject to the jurisdiction thereof,")
   means the regional areas, of land and adjacent waters, over which
   the United States claims and exercises dominion and control as
   a sovereign power,—the term being used in a physical, not a meta-
   phorical sense, and referring to areas and districts having fixity of
   location and recognized boundaries.   P. 122.
3. The territory subject to the jurisdiction of the United States in-
   cludes the land areas under its dominion and control, the ports,
   harbors, bays and other enclosed arms of the sea along its coast,
   and a marginal belt of the sea extending from the coast line out-
   ward a marine league, or three geographic miles; and this terri-
   tory, and all of it, is that which the Amendment designates as its
   field of operation.   P. 122.
4. Domestic merchant ships outside the waters of the United States,
   whether on the high seas or in foreign waters, are part of the
   " territory " of the United States in a metaphorical sense only, and
   are not covered by the Amendment.   P. 123.
5. The jurisdiction arising out of the nationality of a merchant ship,
   as established by her domicile, registry and use of the flag, par-
   takes more of the characteristics of personal than of territorial
   sovereignty, is chiefly applicable to ships on the high seas where
   there is no territorial sovereign; and, as respects ships in foreign

territorial waters, it has little application beyond what is affirmatively or tacitly permitted by the local sovereign. P. 123.

6. The Amendment covers foreign merchant ships when within the territorial waters of the United States. P. 124.

7. A merchant ship of one country, voluntarily entering the territorial limits of another, subjects herself to the jurisdiction of the latter. The jurisdiction attaches in virtue of her presence, just as with other objects within those limits. During her stay she is entitled to the protection of the laws of that place, and correlatively is bound to yield obedience to them. The local sovereign may, out of considerations of public policy, choose to forego the exertion of its jurisdiction, or to exert it in a limited way only, but this is a matter resting solely in its discretion. P. 124.

8. The Eighteenth Amendment does not prescribe any penalties, forfeitures, or mode of enforcement, but by its second section leaves these to legislative action. P. 126.

9. The only instance in which the National Prohibition Act recognizes the possession of intoxicating liquor for beverage purposes as lawful, is where the liquor was obtained before the act went into effect and is kept in the owner's dwelling for use therein by him, his family, and his *bona fide* guests. P. 127.

10. Examination of the National Prohibition Act, as supplemented November 23, 1921, c. 134, 42 Stat. 222, shows,

(*a*) That it is intended to be operative throughout the territorial limits of the United States, with the single exception of liquor in transit through the Panama Canal or on the Panama Railroad,

(*b*) That it is not intended to apply to domestic vessels when outside the territorial waters of the United States,

(*c*) That it is intended to apply to all merchant vessels, whether foreign or domestic, when within those waters, save as the Panama Canal Zone exception provides otherwise. Pp. 127–129.

11. Congress, however, has power to regulate the conduct of domestic merchant ships when on the high seas, or to exert such control over them when in foreign waters as may be affirmatively or tacitly permitted by the territorial sovereign. P. 129.

12. The antiquity of the practice of carrying intoxicating liquors for beverage purposes as part of a ship's sea stores, the wide extent of the practice and its recognition in a congressional enactment, do not go to prove that the Eighteenth Amendment and the Prohibition Act could not have been intended to disturb that practice, since their avowed and obvious purpose was to put an end to prior practices respecting such liquors. P. 129.

13. After the adoption of the Amendment and the enactment of the National Prohibition Act, Congress withdrew the prior statutory recognition of liquors as legitimate sea stores. Rev. Stats., § 2775; Act of September 21, 1922, c. 356, Tit. IV, and § 642, 42 Stat. 858, 948, 989. P. 130.

14. The carrying of intoxicating liquors, as sea stores, for beverage purposes, through the territorial waters or into the ports and harbors, of the United States, by foreign or domestic merchant ships, is forbidden by the Amendment and the act. P. 130.

284 Fed. 890, affirmed.

285 Fed. 79, reversed.

APPEALS from decrees of the District Court dismissing, on the merits, as many suits brought by the appellant steamship companies for the purpose of enjoining officials of the United States from seizing liquors carried by appellants' passenger ships as sea stores and from taking other proceedings against the companies and their vessels, under the National Prohibition Act.

*Mr. George W. Wickersham* for appellants in Nos. 659–662, 666–670, and 678.

I. Neither the Eighteenth Amendment, nor, the National Prohibition Act, properly construed, requires the application of the prohibition to every place where the United States may exercise its power.

This statute contained no provision defining the territory within which it should be operative. It, therefore, was governed by the provisions of Rev. Stats., § 1891: " The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized Territories, and in every Territory hereafter organized as elsewhere within the United States."

A question having arisen as to the jurisdiction of the courts in the territories and insular possessions of the United States to enforce the act, a section was enacted in the Supplemental Act of November 23, 1921. An examination of the debates preceding this discloses only a

most perfunctory consideration of the section. It clearly
appears that the dominating purpose underlying its inclu-
sion in the act was to give power to the courts of Hawaii
and the Virgin Islands to enforce the statute.

There is nothing else in all of the many pages of the
Congressional Record devoted to a discussion of these
two acts which throws any further light upon the terri-
torial limitations of their application. Especially is there
nothing to indicate that Congress was extending the appli-
cation of the law to any place not previously embraced
within the description contained in the Amendment, " the
United States and all the territories subject to the juris-
diction thereof." It surely is a strained construction to
hold that a foreign ship temporarily within American
waters is embraced within the phrase " the territories sub-
ject to the jurisdiction " of the United States. Nothing
in the legislative history of the act supports the conten-
tion that Congress had any such intention.

Evidently Congress was in some doubt as to whether or
not the National Prohibition Act, *ex proprio vigore,* ap-
plied to territories which had not been embodied within
the United States, and, therefore, deemed it necessary
specifically to extend it to such territory. The Philip-
pine Islands undoubtedly are territory subject to the juris-
diction of the United States, yet we have not heard that
the Eighteenth Amendment *ex proprio vigore* applies to
them, nor that the National Prohibition Act governs
them. Moreover, § 20, Tit. III, of that act itself involves
a recognition of the fact that the statute by its own terms
did not apply to everything subject to the jurisdiction of
the United States, because it specifically provides for its
application to the Canal Zone—which has been defined as
not a " territory " but " a place subject to the jurisdiction
of the United States " (25 Ops. Atty. Gen. 441), and also
expressly provides that it shall not apply to liquor in
transit through that zone by railroad or steamship.

It is difficult to understand why, if Congress was right in supposing it could exclude transportation of liquors from the application of the Amendment under any circumstances, it could not exclude it by failure specifically to include, as well as by an exception expressly grafted on to a comprehensive inclusion.

In our view, § 20, Tit. III, involves the expression of an important recognition by Congress that it has power under the Amendment to exclude from the operations of prohibition in some instances, and, if that be true, the words *"territory subject to the jurisdiction thereof"* in the Eighteenth Amendment cannot mean *" wherever the United States may exercise its power,"* as contended by the Government.

The conclusions announced by this Court in the *National Prohibition Cases,* 253 U. S. 350, are not at variance with this view. Nor do we think that *Grogan* v. *Walker & Sons Co.* and *Anchor Line* v. *Aldridge,* 259 U. S. 80, are.

In adopting the broad canon of construction which controlled the decision rendered by this Court in the *Grogan* and *Anchor Line Cases,* it is evident that the Court placed emphasis upon the controlling force of the admonition contained in § 3 of Tit. II of the National Prohibition Act, enjoining liberality of construction, to the end that the use of intoxicating liquor as a beverage might be prevented. Let us consider what meaning and purpose are to be assigned to the Eighteenth Amendment and the enforcing act. Certainly the first sense of every law must be that the field of its operation is the country of its enactment. This is equally true of the Eighteenth Amendment and the National Prohibition Act. Necessarily, they get their meaning from the field and purpose of their operation—from the conditions which exist in the field or are designed to be established there. The transportation that they prohibit is transportation within that field—that is, the United States and its Territories, " for

beverage purposes." The transportation and the pur-
poses are, therefore, complements of each other and both
must exist to fulfill the declared prohibition. Thus con-
sidered, the " admonition " which received such emphasis
in the adoption of this broad canon of construction, and
was relied upon by the lower court herein, loses all force
under the circumstances of the instant case. Liberality of
interpretation is enjoined to the end " that the use of
intoxicating liquor as a beverage " may be prevented.
These words carry with them an unspoken but necessary
qualification, namely, " within the. United States, its Ter-
ritories, Hawaii, and the Virgin Islands."

We have said that the transportation and purposes
are complements of each other and both must exist to
fulfill the required prohibition. The foreign steamship
lines do not seek to transport liquor through, for use as
a beverage within, the United States, its Territories,
Hawaii, or the Virgin Islands.

II. A foreign ship temporarily within the waters of the
United States is not " territory subject to the jurisdic-
tion " of the United States, within the meaning of the
Eighteenth Amendment and the National Prohibition
Act.

The jurisdiction exercised by a State over foreign ves-
sels within her waters has been the subject of much
controversy. On the one hand, it is held that, in a sense,
the vessel is part of the territory of the Nation to which it
belongs, and those on board are subject to its laws, even in
a foreign port (Vattel, book 1, c. 19, § 216; Wheat. Int.
Law, 157; *Brown* v. *Duchesne*, 19 How. 183; *Wilson* v.
*McNamee*, 102 U. S. 572; *United States* v. *Bowman*, 260
U. S. 94), while on the other hand, it is held, with certain
reservations, that by voluntarily coming into the waters
or ports of one Nation, the ships of another submit them-
selves to the laws of the former. *United States* v. *Diekel-
man*, 92 U. S. 520; *Wildenhus's Case*, 120 U. S. 1; *The*

*Exchange,* 7 Cr. 116, 144.    See 2 Moore Int. Law Dig., p. 292; 8 Ops. Atty. Gen. 73; Taylor, Int. Law, § 268; Wheaton, Int. Law, 5th Eng. ed. (Phillipson), p. 169; 2 Wharton, Conflict of Laws, 3d ed., §§ 816, 817; 42 Albany Law Jour., pp. 345–353; 1 Oppenheim, Int. Law, 3d ed., § 189; Ortolan, Diplomatie de la Mer, vol. 1, pp. 192, 193; Gregory, 2 Mich. Law Rev., p. 333; 1 Halleck, Int. Law, 4th ed. (Baker), pp. 245–247; Wheaton, El. Int. Law, 8th ed., § 95, note 58; *United States* v. *Bowman,* 260 U. S. 94.

III. The courts will never give a construction to a statute contrary to international law or the accepted custom and usage of civilized nations, when it is possible reasonably to construe it in any other manner. *The Paquete Habana,* 175 U. S. 677; *Murray* v. *Schooner Charming Betsy,* 2 Cr. 64.

The same rule, *a fortiori,* should apply to the construction of a provision in the Constitution. Presumably, provisions of the latter are not intended to regulate the affairs of foreign nations or to upset established international usage. If, as we contend, the Amendment does not foreclose the question, then it becomes one of statutory construction, namely, whether Congress intended to disregard the long established general rule respecting the jurisdiction of the country of a visiting ship over its internal affairs and to impose its will with respect to such internal management, in cases which cannot in any respect be considered as affecting the peace and order of the port into which the ships come. In construing other statutes which might affect such internal management, the federal courts have been careful to avoid, unless constrained by the obvious, inescapable meaning of the act, giving such construction to the statute as would lead to a conflict of laws, or interference with well settled international usage, or unduly interfere with the internal management of the ship. *The Exchange,* 7 Cr. 116, 136, 146; *Murray* v.

*Schooner Charming Betsy, supra,* 118; *The Brig Wilson*
v. *United States,* Fed. Cas. No. 17,846; *Brown* v. *Du-
chesne,* 19 How. 183; *The State of Maine,* 22 Fed. 734;
*The Kestor,* 110 Fed. 432; *Patterson* v. *Bark Eudora,* 190
U. S. 169; *Wildenhus's Case,* 120 U. S. 1, 11, 12; *Sandberg*
v. *McDonald,* 248 U. S. 185; *Neilson* v. *Rhine Shipping
Co.,* 248 U. S. 205.

So it uniformly has been held that the acts prohibiting
the bringing of Chinese laborers to the United States are
not violated by a foreign vessel coming into one of our
ports with Chinese as seamen or members of the crew.
*In re Moncan,* 14 Fed. 44; *United States* v. *Ah Fook,* 183
Fed. 33; *United States* v. *Burke,* 99 Fed. 895; *United
States* v. *Jamieson,* 185 Fed. 165; appeal dismissed 223
U. S. 744.

See *Taylor* v. *United States,* 207 U. S. 120; *Scharren-
berg* v. *Dollar S. S. Co.,* 245 U. S. 122.

The executive departments also always have exercised
like care in avoiding such interpretative application of
statutes as unnecessarily to interfere with international
commercial relations. 27 Ops. Atty. Gen. 440.

The care which Congress used to exclude opium from
our territorial waters serves also to point out the under-
lying distinction between the situation there existing and
the facts of the instant case. Section 5 of the Opium Act
dealt only with smoking opium, which had no legitimate
uses and which for years had been considered an inter-
national outlaw, the mere presence of which within their
borders was considered intolerable by all civilized nations.
Here, on the other hand, it appears from an examination
of the National Prohibition Act that Congress has per-
mitted the possession and use of intoxicating beverages
in the homes of our people if acquired prior to the effective
date thereof. The act also repeatedly recognizes as legal
the existence of large quantities of bonded liquor within
the United States, as also the manufacture, sale and trans-

portation of intoxicating liquor for other than beverage purposes (§ 3 and § 37 of Tit. II). It cannot, therefore, be said that the National Prohibition Act imposes an *unqualified prohibition,* still less can it be said that Congress intended to prevent the mere presence within our borders of intoxicating beverages under any and all circumstances; for the act itself proves a contrary intention. Congress has not only failed to use language sufficient to indicate that liquor could not be possessed within our borders for any purpose, but, under the system of qualified prohibition imposed by the act, there was no reason why it should prohibit the presence of such liquor within our territorial waters as an incidental element to the continuation of international commerce, sanctioned by the usage and custom of civilized nations since the inception of our Government. In marked contrast with this, also, is the record of congressional action respecting the subject under consideration in the cases at bar. From the date of the enactment of the National Prohibition Act, foreign ships had been bringing into American waters and ports liquors as a part of the ships' stores, for consumption by passengers and crew on the high seas, with the approval and subject to regulations promulgated by the Treasury Department, in conformity with international usage and the uniform course of American law and regulation from the foundation of the Government. This was a matter of newspaper notoriety and general knowledge. Treasury decisions had been promulgated which sanctioned the practice, and the Attorney General of the United States had declared its legality and laid down the rules under which it should be conducted. And yet, in the legislation of 1921, by which Congress sought to strengthen the law in other directions and to clothe the courts of the Territory of Hawaii and the Virgin Islands with jurisdiction to enforce the act, no mention was made of this subject and no attempt to broaden the scope of the law,

so as to apply it to foreign vessels in American ports. It seems incredible that, if Congress had intended to apply prohibition to foreign merchant ships, it would not have expressed such intention in the amending act. The fact that it did not, furnishes strong evidence that it had no intention of interfering with the well established usages of international commerce. This moreover is emphasized by the fact that § 5 of the amending act expressly dealt with the application of prohibition to common carriers by land and sea.

It is important to note in this connection that the provisions of the Transportation Act of 1920 are expressly applicable to foreign merchant vessels; and yet, neither the framers of the act, nor those who discussed it on the floors of Congress, suggested that the amending act should be broadened so as to make it clear that the possession by a foreign common carrier by vessel within American waters of intoxicating liquors for beverage purposes, was prohibited by our laws.

When 'Congress legislated with respect to intoxicating liquors in the Territory of Alaska, by Act of February 14, 1917, 39 Stat. 903, it clearly expressed its intention to apply prohibition to vessels within the territorial waters.

So in dealing with the Canal Zone, Congress, unrestricted by the limitations of the Constitution or the Eighteenth Amendment, but legislating as a domestic legislature, enacted § 20, Tit. III, of the National Prohibition Law. It will be noted that this prohibition went far beyond the Amendment or the National Prohibition Act. It not only prohibited the importation but the introduction into the Canal Zone. It absolutely prohibited possession by an individual or his having under his control any of the described beverages. Then, in order to emphasize its intention that these extreme measures should not be extended so as to interfere with foreign commercial intercourse, it added the proviso.

The provisions affecting the Canal Zone in the National Prohibition Act are not included in the general provisions relating to the United States, but in a specific section incorporated in the act to deal with that place.   Section 20, Tit. III, places the Canal Zone in a special position. It will be noted that Congress has not said in the proviso that the *act* shall not apply to liquor in transit through the Panama Canal or on the Panama Railroad, but that " this *section* " shall not apply.   In other words, as the language of the section goes far beyond the confines of the Amendment and the act, Congress deemed it necessary to disclaim the application of its provisions, that is, the provisions of the *section,* to commerce passing through the Zone.   And, therefore, it cannot be that by referring in § 20 to the carriage on the Panama Canal and on the Panama Railroad, Congress intended that no other transportation of liquor anywhere within the United States, or its possessions, was authorized except through the Canal Zone.   The proviso completes the legislation by Congress respecting the Zone, but it has no bearing on the interpretation of the act itself in its application to the United States.   It does illustrate the care which Congress has taken in this act, as in so many others, to avoid the implication of legislation affecting foreign merchant vessels, save and except in the particulars where its deliberate and expressed policy was to apply legislation to those ships.

IV. Sea stores on merchant ships are considered as part of the ship itself and always have been exempted from tariff and other laws affecting merchandise introduced into the country.   21 Ops. Atty. Gen. 92, 94; Rev. Stats., § 2807, amended by Act June 3, 1892, 27 Stat. 41; *United States* v. *24 Coils of Cordage,* Fed. Cas. No. 16,566; *United States* v. *One Hempen Cable,* Fed. Cas. No. 15,931a; Treasury Circular Dec. 4, 1922; *Brough* v. *Whitmore,* 4 Term. Rep. 206; *The Dundee,* 1 Hagg. Adm.

109; *Gale* v. *Laurie,* 5 B. & C. 156; English Marine Insurance Act 1906, Arnould Marine Insurance, 10th ed., vol. 2, p. 1659; *id.* vol. 1, p. 295.

A further proof of the incorporation of stores into the ship is the fact that they are valued by surveyors, when valuing the ship for general average contribution, as part of the contributory value of the ship. Lowndes, General Average, § 76. It is also a very interesting fact that, in the case of many European nations, a separate list of ship's stores is considered as part of the ship's papers, in addition to the ordinary cargo manifest. In this connection see Atherly Jones on Commerce in War, pp. 347–352. *United States* v. *Hawley & Letzerich,* 160 Fed. 734.

The laws of Italy, France, and Holland require merchant ships trading with their ports to carry and furnish liquors for the consumption of passengers and crew. In those cases, liquors are *necessaries* within the meaning of the admiralty law. See *The Satellite,* 188 Fed. 717.

It was, therefore, in pursuance of a long applied doctrine of sea law and the consistent legislative policy that, after the adoption of the Eighteenth Amendment and the passage of the National Prohibition Act, the Treasury Department promulgated regulations covering sea stores of liquors which have been in force up to the present time. The new opinion of the Attorney General, and the decision of the District Court in the present cases, present to this Court the question of whether or not the necessary construction of the Prohibition Law overrules this consistent, uniform, continued policy of our Government, and, disregarding all international comity, imposes our domestic regulations upon all foreign vessels coming into our ports.

V. Even if the foreign steamships within American ports or waters should be considered as territory subject to the jurisdiction of the United States, nevertheless the carriage of intoxicating liquors as part of their sea stores,

under the circumstances described in the bill, is not a violation of the Amendment or the statute.

It is well settled law, that the carriage of ship stores on board a foreign vessel coming into ports of the United States, and on its departure therefrom, is neither importation into, nor exportation from, the United States. *Swan & Finch Co.* v. *United States,* 190 U. S. 143, 144; *The Conqueror,* 49 Fed. 99, 102; affd. 166 U. S. 110.

That the carriage of liquors from one point to another within the United States may not amount to transportation within the prohibition of the Amendment and the statute, is recognized in *Street* v. *Lincoln Safe Deposit Co.,* 254 U. S. 88. *United States* v. *254 Bottles of Intoxicating Liquor,* 281 Fed. 247.

The Amendment does not make mere possession of intoxicating liquors unlawful. Its prohibition applies only when one lawfully in possession when the Amendment took effect seeks to sell or transport it within the United States, etc., or to export it therefrom, for beverage purposes. If the National Prohibition Act goes beyond this, it exceeds the authority conferred upon Congress by the Amendment. We do not construe it as going beyond the Amendment. The act, recognizing the lawfulness of possession of liquors in a private dwelling, makes possession elsewhere only *prima facie* evidence that it is possessed for an unlawful purpose, and this evidence, of course, is open to rebuttal by the facts of the case.

The actual basis of *Corneli* v. *Moore,* 257 U. S. 491, is stated in the *Grogan Case,* 259 U. S. 80.

In the cases at bar, the liquors are in the strictest sense in the lawful possession of the owners of the steamships, and they remain immovable within the ship as a part of its sea stores, in effect as a part of the ship, in the same sense in which a cable which had been bought in Liverpool by the master of an American vessel, to replace an old

one worn out, was held to be a part of the ship and not to be treated as imported goods, wares or merchandise, in the case of *United States* v. *A Chain Cable,* 2 Sumner, 362; Fed. Cas. 14,776.

The movement of these liquors within our territorial waters, moreover, can in no proper sense be deemed a " transportation " in any accepted sense of the word. The universal and practical conception of transportation, as applied to any article or commodity under any circumstances, presupposes a carrier of some kind or description separate and distinct from the article or thing transported. *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 203.

In the present case there is not any separation of the sea stores from the ship. They are incorporated as it were into the body of the ship. Properly considered, sea stores are really aids to transportation rather than the subject matter thereof. While, of course, all parts of the vessel, including masts, spars, tackle and apparel, as well as sea stores, necessarily move with her when she moves, they are not being transported in the sense of that word as understood by our statutes or case law. It is submitted that the transportation prohibited by the Eighteenth Amendment and the National Prohibition Act is transportation in a commercial sense. Undoubtedly this was present in both the *Grogan* and *Anchor Line Cases.*

Specific reference to the question of transportation is found in §§ 13 and 14 of Tit. II of the act, and here Congress considers the question in some detail by requiring the carriers to mark the consignors' and consignees' names on the outside of all packages, in addition to making clear the contents.

Under the *Street Case, supra,* the conveyance from warehouse to residence was held not to be transportation within the act, because the goods were in the owner's possession in a leased room in a warehouse, and in effect

merely transferred by him to his residence. In the *Corneli Case* a different result was reached because the goods were in possession of the warehouse, and the transfer thereof involved commercial transportation of and delivery to the owner at the latter's residence. Sea stores, like bunker coal, belong to the ship owner and are on board his vessel solely for consumption therein. They are not received from any shipper nor are they to be delivered to any consignee, and transportation is not the purpose of their presence on shipboard. They are brought within the territorial waters of the United States merely because it is unavoidable under the circumstances.

If the National Prohibition Act goes beyond the limits of the Amendment, and prohibits mere possession, it is unsupported by the Constitution, and, to that extent at least, unenforceable. While the language of § 3, Tit. II, does prohibit any person to " possess any intoxicating liquor except as authorized in this act," read in connection with § 33, Tit. II, such unauthorized possession would appear only to be *prima facie* evidence of possession for one of the illegal purposes prescribed in the act, and not in and of itself to be punishable. That this construction is correct is emphasized by the provisions of § 20, Tit. III, where the congressional intention clearly expressed with respect to the Canal Zone is to make possession in and of itself a crime, as also to prohibit, not only the technical " importation " into the Zone, but the introduction of liquor into that specific territory. Not only, too, is possession prohibited, but it is made a crime to have " under one's control within the Canal Zone " any of the specified beverages.

If it be suggested that the Prohibition Act, § 33, Tit. II, makes the possession of liquors by any person not legally permitted by its provisions to possess liquor, evidence that such liquor is kept for purposes prohibited by the statute, the answer is that it is only *prima facie* evidence of that fact.

It is our contention that the cases of liquor carried as part of ship stores in foreign merchant vessels, also fairly fall within the obvious implication of § 33, Tit. II, and that an intention to confiscate the private property in these liquors and to extend the jurisdiction of an act which is, in the most emphatic sense of the term, a domestic police regulation, over the internal concerns of foreign ships, and thus indirectly to foist our laws and our conception of the proper use of alcohol for beverage purposes, over the people of other Nations whose usages and laws differ from ours, has not been expressed by the Eighteenth Amendment nor by Congress.

*Mr. Cletus Keating,* with whom *Mr. John M. Woolsey, Mr. J. Parker Kirlin* and *Mr. Ira A. Campbell* were on the brief, for appellant in No. 693.

I. The District Judge erred in holding that intoxicating liquors which have been legally acquired and which are kept and used only as sea stores by vessels of the United States are within the purview of the Eighteenth Amendment.

Sea stores are consumable provisions kept on board a vessel as part of her equipment for the maintenance of her passengers and crew.

Intoxicating liquors, having the status of sea stores and their situs on board a vessel, do not come within any of the prohibitions of the Eighteenth Amendment, although kept on board a vessel of the United States within territorial waters of the United States.

Intoxicating liquors incorporated as sea stores on a vessel, are not the subject of " importation into " the United States.

When a vessel passes out of our territorial waters, sea stores are not the subject of " exportation from " the United States.

Intoxicating liquors incorporated into sea stores, whilst kept on board a vessel of the United States, mov-

ing in territorial waters, are not the subject of " transportation within " the United States.

The possession of intoxicating liquors, lawfully acquired and kept sealed as sea stores, is legal within the territorial waters of the United States.

II. The District Judge erred in holding that vessels of the United States on the high seas and in foreign ports are territory subject to the jurisdiction of the United States, within the meaning of the Eighteenth Amendment, and subject to the penalties of the National Prohibition Act, and hence were not free to sell intoxicating liquors on the high seas and in foreign ports.

The Eighteenth Amendment was not necessary to give Congress power to legislate for lands subject to the jurisdiction of the United States and not included among the several States, or for vessels of the United States engaged in foreign or coastwise commerce.

Vessels of the United States are not " territory subject to the jurisdiction of the United States " within the meaning of the Eighteenth Amendment, nor are they subject to the National Prohibition Act.

The National Prohibition Act does not by its terms apply and was not intended to apply to vessels of the United States on the high seas or in foreign ports.

III. The unnecessary adoption of a fiction in constitutional construction that would attribute to the word " territory " as used in the Eighteenth Amendment a meaning which would include vessels of the United States upon the high seas and in foreign ports, would lead to embarrassing international situations.

IV. Neither the history nor purpose of the Eighteenth Amendment and its enforcement acts indicates any intention on the part of Congress to extend prohibition to vessels of the United States while on the high seas or in foreign ports.

In considering whether Congress intended that vessels of the United States should be considered "territory" within the meaning of the Amendment and the enforcement acts, § 20 of the National Prohibition Act is of great importance.

It seems hardly conceivable that Congress would place an additional obstacle in the way of the establishment of an American merchant marine, when the additional burden imposed was not essential to carry out the fundamental purposes of the prohibition reform. Vessels of the United States engaged in foreign trade go to all parts of the world, and are in competition with ships of foreign nations. The construction of the Amendment and the enforcement acts here contended for would not constitute an interference or limitation upon what everyone realizes is a great national reform.

*Mr. Reid L. Carr,* with whom *Mr. George Adams Ellis* and *Mr. Frederick H. Stokes* were on the brief, for appellants in No. 694.

The word "territory" as employed in the Eighteenth Amendment must be construed according to the meaning fixed upon it in our constitutional history.

A ship is not territory, within the meaning of the Eighteenth Amendment or the enforcing legislation.

As a matter of statutory construction, the Prohibition Acts negative the intention of Congress to extend their operation to vessels of the United States on the high seas or in foreign ports.

*Mr. Solicitor General Beck* and *Mrs. Mabel Walker Willebrandt,* Assistant Attorney General, with whom *Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, was on the briefs, for appellees.

*Mr. Andrew Wilson* and *Mr. Wayne B. Wheeler,* by leave of court, filed a brief as *amici curiae.*

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

These are suits by steamship companies operating passenger ships between United States ports and foreign ports to enjoin threatened application to them and their ships of certain provisions of the National Prohibition Act.  The defendants are officers of the United States charged with the act's enforcement.  In the first ten cases the plaintiffs are foreign corporations and their ships are of foreign registry, while in the remaining two the plaintiffs are domestic corporations and their ships are of United States registry.  All the ships have long carried and now carry, as part of their sea stores, intoxicating liquors intended to be sold or dispensed to their passengers and crews at meals and otherwise for beverage purposes.  Many of the passengers and crews are accustomed to using such beverages and insist that the ships carry and supply liquors for such purposes.  By the laws of all the foreign ports at which the ships touch this is permitted and by the laws of some it is required.  The liquors are purchased for the ships and taken on board in the foreign ports and are sold or dispensed in the course of all voyages, whether from or to those ports.

The administrative instructions dealing with the subject have varied since the National Prohibition Act went into effect.  December 11, 1919, the following instructions were issued (T. D. 38218):

"All liquors which are prohibited importation, but which are properly listed as sea stores on vessels arriving in ports of the United States, should be placed under seal by the boarding officer and kept sealed during the entire time of the vessel's stay in port, no part thereof to be removed from under seal for use by the crew at meals or for any other purpose.

" Excessive or surplus liquor stores are no longer dutiable, being prohibited importation, but are subject to seizure and forfeiture.

" Liquors properly carried as sea stores may be returned to a foreign port on the vessel's changing from the foreign to the coasting trade, or may be transferred under supervision of the customs officers from a vessel in foreign trade, delayed in port for any cause, to another vessel belonging to the same line or owner."

January 27, 1920, the first paragraph of those instructions was changed (T. D. 38248) so as to read:

"All liquors which are prohibited importation, but which are properly listed as sea stores on American vessels arriving in ports of the United States, should be placed under seal by the boarding officer and kept sealed during the entire time of the vessel's stay in port, no part thereof to be removed from under seal for use by the crew at meals or for any other purpose. All such liquors on foreign vessels should be sealed on arrival of the vessels in port, and such portions thereof released from seal as may be required from time to time for use by the officers and crew."

October 6, 1922, the Attorney General, in answer to an inquiry by the Secretary of the Treasury, gave an opinion to the effect that the National Prohibition Act, construed in connection with the Eighteenth Amendment to the Constitution, makes it unlawful (a) for any ship, whether domestic or foreign, to bring into territorial waters of the United States, or to carry while within such waters, intoxicating liquors intended for beverage purposes, whether as sea stores or cargo, and (b) for any domestic ship even when without those waters to carry such liquors for such purposes either as cargo or sea stores. The President thereupon directed the preparation, promulgation and application of new instructions conforming to that construction of the act. Being advised of this and that under the new instructions the defendants would seize all liquors carried in contravention of the act as so construed and would proceed to sub-

ject the plaintiffs and their ships to penalties provided in the act, the plaintiffs brought these suits.

The hearings in the District Court were on the bills or amended bills, motions to dismiss and answers, and there was a decree of dismissal on the merits in each suit. 284 Fed. 890; 285 Fed. 79. Direct appeals under Judicial Code, § 238, bring the cases here.

While the construction and application of the National Prohibition Act is the ultimate matter in controversy, the act is so closely related to the Eighteenth Amendment, to enforce which it was enacted, that a right understanding of it involves an examination and interpretation of the Amendment. The first section of the latter declares, 40 Stat. 1050, 1941:

"Section 1: After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited."

These words, if taken in their ordinary sense, are very plain. The articles proscribed are intoxicating liquors for beverage purposes. The acts prohibited in respect of them are manufacture, sale and transportation within a designated field, importation into the same, and exportation therefrom. And the designated field is the United States and all territory subject to its jurisdiction. There is no controversy here as to what constitutes intoxicating liquors for beverage purposes; but opposing contentions are made respecting what is comprehended in the terms "transportation," "importation" and "territory."

Some of the contentions ascribe a technical meaning to the words "transportation" and "importation." We think they are to be taken in their ordinary sense, for it better comports with the object to be attained. In that

sense transportation comprehends any real carrying about or from one place to another. It is not essential that the carrying be for hire, or by one for another; nor that it be incidental to a transfer of the possession or title. If one carries in his own conveyance for his own purposes it is transportation no less than when a public carrier at the instance of a consignor carries and delivers to a consignee for a stipulated charge. See *United States* v. *Simpson,* 252 U. S. 465. Importation, in a like sense, consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a custom house is not of the essence of the act.

Various meanings are sought to be attributed to the term " territory " in the phrase " the United States and all territory subject to the jurisdiction thereof." We are of opinion that it means the regional areas—of land and adjacent waters—over which the United States claims and exercises dominion and control as a sovereign power. The immediate context and the purport of the entire section show that the term is used in a physical and not a metaphorical sense,—that it refers to areas or districts having fixity of location and recognized boundaries. See *United States* v. *Bevans,* 3 Wheat, 336, 390.

It now is settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea along its coast and a marginal belt of the sea extending from the coast line outward a marine league, or three geographic miles. *Church* v. *Hubbart,* 2 Cranch, 187, 234; *The Ann,* 1 Fed. Cas., p. 926; *United States* v. *Smiley,* 27 Fed. Cas., p. 1132; *Manchester* v. *Massachusetts,* 139 U. S. 240, 257–258; *Louisiana* v. *Mississippi,* 202 U. S. 1, 52; 1 Kent's Com., 12th ed., *29; 1 Moore

International Law Digest, § 145; 1 Hyde International Law, §§ 141, 142, 154; Wilson International Law, 8th ed., § 54; Westlake International Law, 2d ed., p. 187, *et seq;* Wheaton International Law, 5th Eng. ed. (Phillipson), p. 282; 1 Oppenheim International Law, 3d ed., §§ 185–189, 252. This, we hold, is the territory which the Amendment designates as its field of operation; and the designation is not of a part of this territory but of " all " of it.

The defendants contend that the Amendment also covers domestic merchant ships outside the waters of the United States, whether on the high seas or in foreign waters. But it does not say so, and what it does say shows, as we have indicated, that it is confined to the physical territory of the United States. In support of their contention the defendants refer to the statement sometimes made that a merchant ship is a part of the territory of the country whose flag she flies. But this, as has been aptly observed, is a figure of speech, a metaphor. *Scharrenberg* v. *Dollar S. S. Co.,* 245 U. S. 122, 127; *In re Ross,* 140 U. S. 453, 464; 1 Moore International Law Digest, § 174; Westlake International Law, 2d ed., p. 264; Hall International Law, 7th ed. (Higgins), § 76; Manning Law of Nations (Amos), p. 276; Piggott Nationality, Pt. II, p. 13. The jurisdiction which it is intended to describe arises out of the nationality of the ship, as established by her domicile, registry and use of the flag, and partakes more of the characteristics of personal than of territorial sovereignty. See *The Hamilton,* 207 U. S. 398, 403; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 355; 1 Oppenheim International Law, 3d ed., §§ 123–125, 128. It is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign. 2 Moore International

Law Digest, §§ 204, 205; Twiss Law of Nations, 2d ed., § 166; Woolsey International Law, 6th ed., § 58; 1 Oppenheim International Law, 3d ed., §§ 128, 146, 260.

The defendants further contend that the Amendment covers foreign merchant ships when within the territorial waters of the United States. Of course, if it were true that a ship is a part of the territory of the country whose flag she carries, the contention would fail. But, as that is a fiction, we think the contention is right.

A merchant ship of one country voluntarily entering the territorial limits of another subjects herself to the jurisdiction of the latter. The jurisdiction attaches in virtue of her presence, just as with other objects within those limits. During her stay she is entitled to the protection of the laws of that place and correlatively is bound to yield obedience to them. Of course, the local sovereign may out of considerations of public policy choose to forego the exertion of its jurisdiction or to exert the same in only a limited way, but this is a matter resting solely in its discretion. The rule, now generally recognized, is nowhere better stated than in *The Exchange,* 7 Cranch, 116, 136, 144, where Chief Justice Marshall, speaking for this Court, said:

" The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.

"All exceptions, therefore, to the full and complete power of a nation, within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.

\* \* \* \* \* \* \*

" When private individuals of one nation spread themselves through another, as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country. Nor can the foreign sovereign have any motive for wishing such exemption. His subjects thus passing into foreign countries, are not employed by him, nor are they engaged in national pursuits. Consequently, there are powerful motives for not exempting persons of this description from the jurisdiction of the country in which they are found, and no one motive for requiring it. The implied license, therefore, under which they enter, can never be construed to grant such exemption."

That view has been reaffirmed and applied by this Court on several occasions. *United States* v. *Diekelman,* 92 U. S. 520, 525, 526; *Wildenhus's Case,* 120 U. S. 1, 11; *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659; *Knott* v. *Botany Mills,* 179 U. S. 69, 74; *Patterson* v. *Bark Eudora,* 190 U. S. 169, 176, 178; *Strathearn S. S. Co.* v. *Dillon,* 252 U. S. 348, 355–356. And see *Buttfield* v. *Stranahan,* 192 U. S. 470, 492–493; *Oceanic Steam Navigation Co.* v. *Stranahan,* 214 U. S. 320, 324; *Brolan* v. *United States,* 236 U. S. 216, 218. In the *Patterson Case* the Court added:

" Indeed, the implied consent to permit them [foreign merchant ships] to enter our harbors may be withdrawn, and if this implied consent may be wholly withdrawn it may be extended upon such terms and conditions as the government sees fit to impose."

In principle, therefore, it is settled that the Amendment could be made to cover both domestic and foreign

merchant ships when within the territorial waters of the United States. And we think it has been made to cover both when within those limits. It contains no exception of ships of either class and the terms in which it is couched indicate that none is intended. Such an exception would tend to embarrass its enforcement and to defeat the attainment of its obvious purpose, and therefore cannot reasonably be regarded as implied.

In itself the Amendment does not prescribe any penalties, forfeitures or mode of enforcement, but by its second section [1] leaves these to legislative action.

With this understanding of the Amendment, we turn to the National Prohibition Act, c. 85, 41 Stat. 305, which was enacted to enforce it. The act is a long one and most of its provisions have no real bearing here. Its scope and pervading purpose are fairly reflected by the following excerpts from Title II:

" Sec. 3. No person [2] shall on or after the date when the eighteenth amendment to the Constitution of the United States goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this Act, and all provisions of this Act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented.

" Sec. 21. Any room, house, building, boat, vehicle, structure, or place where intoxicating liquor is manufactured, sold, kept, or bartered in violation of this title, and all intoxicating liquor and property kept and used

---

[1] The second section says: "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation." For its construction, see *United States* v. *Lanza*, 260 U. S. 377.

[2] The act contains a provision (§ 1 of Title II) showing that it uses the word " person " as including " associations, copartnerships, and corporations " when the context does not indicate otherwise.

in maintaining the same, is hereby declared to be a common nuisance. . . ."

" Sec. 23. That any person who shall, with intent to effect a sale of liquor, by himself, his employee, servant, or agent, for himself or any person, company or corporation, keep or carry around on his person, or in a vehicle, or other conveyance whatever, . . . any liquor . . . in violation of this title is guilty of a nuisance . . ."

"Sec. 26. When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. . . ."

Other provisions show that various penalties and forfeitures are prescribed for violations of the act; and that the only instance in which the possession of intoxicating liquor for beverage purposes is recognized as lawful is where the liquor was obtained before the act went in effect and is kept in the owner's dwelling for use therein by him, his family, and his *bona fide* guests.

As originally enacted the act did not in terms define its territorial field, but a supplemental provision [3] afterwards enacted declares that it " shall apply not only to the United States but to all territory subject to its jurisdiction," which means that its field coincides with that of the Eighteenth Amendment. There is in the act no provision making it applicable to domestic merchant ships when outside the waters of the United States, nor any provision making it inapplicable to merchant ships, either domestic or foreign, when within those waters, save in the Panama Canal. There is a special provision dealing

---

[3] Section 3, Act November 23, 1921, c. 134, 42 Stat. 222.

with the Canal Zone [4] which excepts "liquor in transit through the Panama Canal or on the Panama Railroad." The exception does not discriminate between domestic and foreign ships, but applies to all liquor in transit through the canal, whether on domestic or foreign ships. Apart from this exception, the provision relating to the Canal Zone is broad and drastic like the others.

Much has been said at the bar and in the briefs about the Canal Zone exception, and various deductions are sought to be drawn from it respecting the applicability of the act elsewhere. Of course the exception shows that Congress, for reasons appealing to its judgment, has refrained from attaching any penalty or forfeiture to the transportation of liquor while "in transit through the Panama Canal or on the Panama Railroad." Beyond this it has no bearing here, save as it serves to show that where in other provisions no exception is made in respect of merchant ships, either domestic or foreign, within the waters of the United States, none is intended.

Examining the act as a whole, we think it shows very plainly, first, that it is intended to be operative throughout the territorial limits of the United States, with the single exception stated in the Canal Zone provision; secondly, that it is not intended to apply to domestic vessels when outside the territorial waters of the United States,

_____

[4] The pertinent portion of § 20 of Title III, relating to the Canal Zone, is as follows:

"Sec. 20. That it shall be unlawful to import or introduce into the Canal Zone, or to manufacture, sell, give away, dispose of, transport, or have in one's possession or under one's control within the Canal Zone, any alcoholic, fermented, brewed, distilled, vinous, malt, or spirituous liquors, except for sacramental, scientific, pharmaceutical, industrial, or medicinal purposes, under regulations to be made by the President, and any such liquors within the Canal Zone in violation hereof shall be forfeited to the United States and seized: *Provided*, That this section shall not apply to liquor in transit through the Panama Canal or on the Panama Railroad."

and, thirdly, that it is intended to apply to all merchant vessels, whether foreign or domestic, when within those waters, save as the Panama Canal Zone exception provides otherwise.

In so saying we do not mean to imply that Congress is without power to regulate the conduct of domestic merchant ships when on the high seas, or to exert such control over them when in foreign waters as may be affirmatively or tacitly permitted by the territorial sovereign; for it long has been settled that Congress does have such power over them. *Lord* v. *Steamship Co.,* 102 U. S. 541; *The Abby Dodge,* 223 U. S. 166, 176. But we do mean that the National Prohibition Act discloses that it is intended only to enforce the Eighteenth Amendment and limits its field of operation, like that of the Amendment, to the territorial limits of the United States.

The plaintiffs invite attention to data showing the antiquity of the practice of carrying intoxicating liquors for beverage purposes as part of a ship's sea stores, the wide extent of the practice and its recognition in a congressional enactment, and argue therefrom that neither the Amendment nor the act can have been intended to disturb that practice. But in this they fail to recognize that the avowed and obvious purpose of both the Amendment and the act was to put an end to prior practices respecting such liquors, even though the practices had the sanction of antiquity, generality and statutory recognition. Like data could be produced and like arguments advanced by many whose business, recognized as lawful theretofore, was shut down or curtailed by the change in national policy. In principle the plaintiffs' situation is not different from that of the innkeeper whose accustomed privilege of selling liquor to his guests is taken away, or that of the dining-car proprietor who is prevented from serving liquor to those who use the cars which he operates to and fro across our northern and southern boundaries.

It should be added that after the adoption of the Amendment and the enactment of the National Prohibition Act Congress distinctly withdrew the prior statutory recognition of liquors as legitimate sea stores. The recognition was embodied in § 2775 of the Revised Statutes, which was among the provisions dealing with customs administration, and when, by the Act of September 21, 1922, those provisions were revised, that section was expressly repealed along with other provisions recognizing liquors as legitimate cargo. C. 356, Title IV and § 642, 42 Stat. 858, 948, 989. Of course, as was observed by the District Court, the prior recognition, although representing the national policy at the time, was not in the nature of a promise for the future.

It therefore is of no importance that the liquors in the plaintiffs' ships are carried only as sea stores. Being sea stores does not make them liquors any the less; nor does it change the incidents of their use as beverages. But it is of importance that they are carried through the territorial waters of the United States and brought into its ports and harbors. This is prohibited transportation and importation in the sense of the Amendment and the act. The recent cases of *Grogan* v. *Walker & Sons* and *Anchor Line* v. *Aldridge,* 259 U. S. 80, are practically conclusive on the point. The question in one was whether carrying liquor intended as a beverage through the United States from Canada to Mexico was prohibited transportation under the Amendment and the act, the liquor being carried in bond by rail, and that in the other was whether the transshipment of such liquor from one British ship to another in the harbor of New York was similarly prohibited, the liquor being in transit from Scotland to Bermuda. The cases were considered together and an affirmative answer was given in each, the Court saying in the opinion, p. 89:

" The Eighteenth Amendment meant a great revolution in the policy of this country, and presumably and

obviously meant to upset a good many things on as well as off the statute book. It did not confine itself in any meticulous way to the use of intoxicants in this country. It forbade export for beverage purposes elsewhere. True this discouraged production here, but that was forbidden already, and the provision applied to liquors already lawfully made. See *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 151, n. 1. It is obvious that those whose wishes and opinions were embodied in the Amendment meant to stop the whole business. They did not want intoxicating liquor in the United States and reasonably may have thought that if they let it in some of it was likely to stay. When, therefore, the Amendment forbids not only importation into and exportation from the United States but transportation within it, the natural meaning of the words expresses an altogether probable intent. The Prohibition Act only fortifies in this respect the interpretation of the Amendment itself. The manufacture, possession, sale and transportation of spirits and wine for other than beverage purposes are provided for in the act, but there is no provision for transshipment or carriage across the country from without. When Congress was ready to permit such a transit for special reasons, in the Canal Zone, it permitted it in express words. Title III, § 20, 41 Stat. 322."

Our conclusion is that in the first ten cases—those involving foreign ships—the decrees of dismissal were right and should be affirmed, and in the remaining two— those involving domestic ships—the decrees of dismissal were erroneous and should be reversed with directions to enter decrees refusing any relief as respects the operations of the ships within the territorial waters of the United States and awarding the relief sought as respects operations outside those waters.

*Decrees in Nos.* 659, 660, 661, 662, 666, 667, 668, 669, 670 and 678,                                    *Affirmed.*

*Decrees in Nos.* 693 and 694,                          *Reversed.*

Mr. Justice McReynolds, dissents.

Mr. Justice Sutherland, dissenting.

I agree with the judgment of the Court in so far as it affects domestic ships, but I am unable to accept the view that the Eighteenth Amendment applies to foreign ships coming into our ports under the circumstances here disclosed.

It would serve no useful purpose to give my reasons at any length for this conclusion. I therefore state them very generally and briefly.

The general rule of international law is that a foreign ship is so far identified with the country to which it belongs that its internal affairs, whose effect is confined to the ship, ordinarily are not subjected to interference at the hands of another State in whose ports it is temporarily present, 2 Moore, Int. Law Dig., p. 292; *United States* v. *Rodgers,* 150 U. S. 249, 260; *Wildenhus's Case,* 120 U. S. 1, 12; and, as said by Chief Justice Marshall, in *Murray* v. *Schooner Charming Betsy,* 2 Cranch, 64, 118: " . . . an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains. . . ."

That the Government has full power under the Volstead Act to prevent the landing or transshipment from foreign vessels of intoxicating liquors or their use in our ports is not doubted, and, therefore, it may provide for such assurances and safeguards as it may deem necessary to those ends. Nor do I doubt the power of Congress to do all that the Court now holds has been done by that act, but such power exists not under the Eighteenth Amendment, to whose provisions the act is confined, but by virtue of other provisions of the Constitution, which Congress here has not attempted to exercise. With great deference to the contrary conclusion of the Court, due regard for the principles of international comity, which exist be-

tween friendly nations, in my opinion, forbids the construction of the Eighteenth Amendment and of the act which the present decision advances. Moreover, the Eighteenth Amendment, it must not be forgotten, confers concurrent power of enforcement upon the several States, and it follows that if the General Government possesses the power here claimed for it under that Amendment, the several States within their respective boundaries, possess the same power. It does not seem possible to me that Congress, in submitting the Amendment or the several States in adopting it, could have intended to vest in the various seaboard States a power so intimately connected with our foreign relations and whose exercise might result in international confusion and embarrassment.

In adopting the Eighteenth Amendment and in enacting the Volstead Act the question of their application to foreign vessels in the circumstances now presented does not appear to have been in mind. If, upon consideration, Congress shall conclude that when such vessels, in good faith carrying liquor among their sea stores, come temporarily into our ports their officers should, *ipso facto,* become liable to drastic punishment and the ships themselves subject to forfeiture, it will be a simple matter for that body to say so in plain terms. But interference with the purely internal affairs of a foreign ship is of so delicate a nature, so full of possibilities of international misunderstandings and so likely to invite retaliation that an affirmative conclusion in respect thereof should rest upon nothing less than the clearly expressed intention of Congress to that effect, and this I am unable to find in the legislation here under review.