1 F.2d 1004 (1924)
THE FRANCES LOUISE (two cases).
UNITED STATES
v.
3,500 CASES OF ALCOHOL.
Nos. 2745, 2746, 2755.
District Court, D. Massachusetts.
September 30, 1924.
Laurence Curtis, Second Asst. U. S. Atty., of Boston, Mass.
Wm. H. Lewis and Matthew L. McGrath, both of Boston, Mass., for defendant.
MORTON, District Judge.
These are three libels, the first for the forfeiture of the schooner, the second for the forfeiture of the cargo, and the third for penalties against the schooner. By agreement of parties they were consolidated for hearing and were heard together. There is no real controversy as to the facts.
*1005 The Frances Louise is a Canadian schooner, her home port being Lunenburg, N. S. She had a Canadian register and a Canadian crew. She was chartered at Lunenberg to one Rumeau. The charter is not in evidence, and the terms of it are not stated. It seems to have been a cargo charter, because the vessel was operated by her master and crew, and appears to have been under the general direction of her manager owner, Adams. The schooner proceeded from Lunenberg to Havana, Cuba, where she loaded a cargo of alcohol, and then returned to Lunenberg. She sailed from there with this cargo on June 30, 1924, and arrived off this coast on July 8th, anchoring about 22 miles offshore. She subsequently shifted her position slightly, so that the nearest land to her was the northerly tip of Cape Cod, 16½ miles distant in a southerly direction. Shortly after her arrival on her station she was visited by one J. D. Stewart. He delivered to her master, Backman, a number of slips of paper, on which were written various amounts in cases, e. g., "100 cases," "200 cases," and "50 cases." Some of the slips had other marks as well. Stewart instructed Backman to deliver the cargo to the persons who presented carbon duplicates of the slips which had been handed to him. Stewart then returned to shore, having in his custody, or at least in his control, the duplicate slips. He suggested that the schooner should change her position, and she did so, as above stated. But he appears not to have attempted to exercise any control over her movements.
From time to time, while the schooner lay at anchor, as above stated, small boats from shore visited her, presented the duplicate slips, and received alcohol in accordance therewith, which they then smuggled ashore. These boats did not belong to the schooner; she had no control over them, and no relations with them, except to deliver alcohol in accordance with the orders presented. The testimony of her captain is that the alcohol was delivered at the schooner's rail and was taken from there by the crews of the various boats.
One of the motorboats which visited the Frances Louise was the Katherine B. She presented an order for 100 cases of alcohol. As she was unable to carry that amount, only 50 cases were taken by her, and Capt. Backman gave her master a drawback receipt for 50 cases. This took place on July 11th, at 9 p. m. The Katherine B did not have gasoline enough to reach shore; and she was given 10 gallons by the master of the schooner in order to enable her to do so. He also gave her master the compass course to run in. On her way in the Katherine B was seized by revenue officers, who then learned where her cargo came from. On July 14th, at 11 p. m., treasury officials from the revenue cutter Ossipee boarded the Frances Louise, took her papers, seized her, and brought her into Boston. Subsequently the present libels were filed, and process issued against her.
At the time of the seizure the treasury officials were under the impression that the Katherine B was capable of making the distance from the Frances Louise to land within one hour. It was upon this ground that the schooner was seized as coming within the provisions of the treaty between this country and England, which went into effect on May 22, 1924. Subsequent investigation showed that the Katherine B was not capable of such speed. The government officials thereupon asserted the right to seize the schooner outside of the provisions of the treaty. No contention is now made by the government that the seizure is within the terms of said treaty. The government's present contention is that as the schooner was "trading with the shore"  by which is meant that she was delivering alcohol to small boats which put out from the shore  she is subject to seizure and forfeiture under the general principles of international law; and that the treaty does not cut down this general right of seizure.
I have great doubt whether any such broad right of seizure exists as the government contends. But it is not necessary to decide this question, because I am clearly of opinion that the whole situation is covered by the treaty. The circumstances surrounding the execution of that treaty are matters of general knowledge. Vessels of British registry were lying off our coasts, delivering liquor to small boats, which smuggled it ashore. Seizures of such vessels were made by our officials, which were regarded by the British government as unjustified by international law, and led to representations by the British government to this country. On the other hand, British ships found themselves much embarrassed by the decision of the Supreme Court in Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306, concerning supplies of liquor which they customarily carried for use on board. Under these circumstances the treaty was negotiated. It dealt explicitly with the case of liquor ships hovering on our coast and being *1006 visited by small boats from shore. Of course, such small boats only come to the hovering vessel to get contraband goods. Both parties understood that. The plain inference is that such trading does not render the hovering vessel amenable to seizure as long as she keeps to the high seas, except as provided in the treaty. I think both nations intended the treaty to deal with the matter in a complete way. If so, upon familiar principles of law, it is conclusive. See Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 427, 436, 437, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075. The construction of it is a judicial question. Jones v. Meehan, 175 U. S. 1, at page 32, 20 S. Ct. 1, 44 L. Ed. 49. I have no doubt that it is constitutional.
It follows that each of the libels must be dismissed.