**Milton M. MATHEWS et al.**

v.

**Captain J. A. HALFORD, S. S. LETITIA LYKES, et al.**

Civ. A. No. 71-3525.

United States District Court,
E. D. Louisiana.

Oct. 12, 1973.

Judgment affirmed 5 Cir., 493 F.2d 663.

Revius O. Ortique, Jr., David E. Hogan, New Orleans, La., for plaintiffs.

Frederick S. Kullman, Michael S. Fawer, Kullman, Lang, Inman & Bee, New Orleans, La., for defendants.

## REASONS FOR JUDGMENT

R. BLAKE WEST, District Judge.

Plaintiffs in this matter seek damages allegedly sustained by them as a result of an incident aboard the SS LETITIA LYKES while that ship was in the port of Singapore in January, 1971. Jurisdiction is based upon the general maritime law and the provisions of 42 U.S.C. § 1981. Having determined that there exists no dispute as to the facts, and that defendants did not breach any duty owed to plaintiffs under the law, the Court granted the motion of defendants for summary judgment on September 19, 1973.

On January 2, 1971, the SS LETITIA LYKES arrived in the port of Singapore. At that time plaintiffs Milton Mathews, Vinson Davis, Rupert Hemmons, Freddy Martin, and William Holt were seamen aboard the vessel. Defendant Halford was captain of the SS LETITIA LYKES.

Upon the arrival of the vessel in port, immigration officials of the Singapore government came aboard the vessel. After asking the Captain to tell them if

there were any Afro-Americans in the ship's crew, the officials examined the Merchant Marine documents of each crew member. In the case of the five plaintiffs, who were the only Afro-American crew members, the officials confiscated their "Z cards" and issued these individuals forty-eight hour passes, forty-eight hours being the length of time the vessel was scheduled to remain in the port. Upon this action by the Singapore officials, Captain Halford inquired as to the reason for the procedure, to which it was replied that the action was "official". The captain then asked the Lykes agent who was aboard at the time to repeat the question in Chinese. This was done, and the response was the same. Thereafter, upon the docking of the vessel, all crew members, including plaintiffs, were granted shore leave by the Captain. It is clear from the record that the plaintiffs had access to the shore as did all other crew members. The only difference was that plaintiffs went ashore with forty-eight hour passes, which they held in lieu of their "Z cards". Furthermore, it is clear from the record that, when it was learned that the vessel's stay in the port would be extended for another forty-eight hours, the Captain obtained extensions of the forty-eight hour passes for the plaintiffs. In summary, the plaintiffs at all times that the vessel was in port had access to the shore as did all other crew members.

Following the incident aboard the SS LETITIA LYKES and another which took place in the airport in Singapore, which incidents were reported in the press, the State Department made inquiry into the matter. According to the State Department report entitled "Background of the Incident Involving the S. S. Letitia Lykes":

"In conversations between the Government of Singapore and the American Embassy on January 6, 1971, a Singapore Government Official related the following:

'The Government of Singapore has obtained a report that African extremists might try to assert their views, especially those concerning arms sales to South Africa, during the forthcoming Commonwealth Prime Ministers' meeting scheduled for January 14, 1971 [at which it was expected that Queen Elizabeth would appear]. The Government of Singapore had also received a report that American Black Power elements might be involved. Accordingly the Government of Singapore issued instructions to immigration authorities to prevent the entry of extremists. Regrettably, the immigration officials at the airport handled the arrival of black Americans in a clumsy manner. On learning of these incidents, the Singapore Government issued orders to immigration officials at the airport to be more selective and sensible in the handling of similar cases in the future. Unfortunately, these orders did not get transmitted to the immigration officials assigned to the harbor area. This was the reason that the black American seamen were given different treatment than other seamen aboard the vessel.'

The official further stated that the Singapore Government had now ordered all immigration officials to be more sensible in their handling of these cases. All persons regardless of race who have bona fide purposes will be accorded normal immigration treatment in the future, he said."

█ It is the position of defendants, in which the Court concurs, that the incident which is the basis of plaintiffs' complaints was not the result of any action of Lykes, its employees, or agents, but that of a sovereign state acting in its official capacity, and that plaintiffs had free access to shore and were therefore able to report the incident to the U. S. Consul if they so chose.

It is the position of plaintiffs that the discriminatory confiscation of the "Z cards" by the Singapore authorities had some deleterious effect on the welfare and movements of the plaintiffs while in Singapore. Plaintiffs argue that the

Captain should not have identified the five plaintiffs, who were the only Afro-Americans, and in addition should have reported the incident to the U. S. Consul.

In argument of the motion, counsel for plaintiffs referred to the fact that plaintiffs were ". . . treated differently by the Singapore officials" and in response to a question from the Court answered that the confiscation of the "Z cards" and the different treatment of the plaintiffs were not the result of any action taken by Lykes Brothers. However, counsel contended that the Captain and other defendants should not have allowed the discriminatory treatment by the Singapore officials.

It is the opinion of the Court, that, while the Singapore officials certainly could and should have used better judgment in their handling of the situation, and that their actions created an unpleasant situation for plaintiffs, the controlling issue is whether or not defendants, Captain Halford or Lykes Brothers, breached any duty owed to plaintiffs. It is the conclusion of the Court that clearly they did not.

When a ship enters the territorial limits of another country, she subjects herself to the jurisdiction of the foreign sovereign. Cunard Steamship Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L. Ed. 894 (1923).

The master of a vessel owes a very high duty of care and protection to his crew and is charged with the duty of caring for the safety of the crew at all times whether or not they ask for such protection. The standard of whether or not the master of the crew has met this duty is that of a reasonable man under the same or similar circumstances. Zanca v. Delta Steamship Lines, 246 F. Supp. 127 (E.D.La., 1965).

It is the duty of the master of a vessel to allow his crew free access to the consul and he should not restrict them in any way from bringing their complaints to the consulate. In the event that the seamen cannot go ashore to see the consul, it is incumbent upon the master to advise the consul of the problem so that the consul can go on board the vessel to hear the complaint. Norris, The Law of Seamen, 3rd Ed., § 34.

In the instant matter, it is clear that plaintiffs were free to go ashore and that Captain Halford's actions were reasonable under the circumstances. The discriminatory acts were not those of the Captain or of Lykes, but were those of a foreign sovereign in whose port the vessel was. The Captain did not in any way restrict the freedom of movement of the plaintiffs, who received shore leave. Plaintiffs were free to go to the American consul to advise him of the problem. Plaintiffs have presented no citation of authority, nor is the Court aware of any, to support the proposition that, once plaintiffs were given passes and shore leave, it was the Captain's further affirmative duty to make any complaint on behalf of the plaintiffs to the American consulate.

For the foregoing reasons, the motions of defendants for summary judgment have been granted.