## THE GEORGE AND EARL.

District Court, E. D. New York. November 16, 1928.

442

William A. De Groot, U. S. Atty., of Brooklyn, N. Y. (Alex Pisciotta, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Louis Halle, of New York City, for claimant.

INCH, District Judge. The government originally filed a libel against the British schooner George and Earl to forfeit both the ship and the cargo of liquor, pursuant to the provisions of sections 453, 593, 594, and 586 of the Tariff Act of 1922 (19 USCA §§ 266, 497, 498, 488), and section 26 of the National Prohibition Act (27 USCA § 40). Four months thereafter, on January 31, 1928, the government filed the present amended libel, which limits the causes for forfeiture simply to a violation of section 584 of the said Tariff Act of 1922 (19 USCA § 486). It is assumed, therefore, that the sole ground relied on now is the alleged violation of said section 584 of said act.

Motion was made to dismiss this amended libel on the ground that the court should hold as a matter of law that the seizure of the vessel took place at a certain point outside of the jurisdiction of this court, and that nowhere in said libel did it appear that the cargo was consigned to the master, etc. This motion was denied, and the alleged owner of the vessel and the alleged owner of the cargo appeared and answered the amended libel. The issue came on for trial, and certain testimony was taken, which included the deposition of the master of the seized schooner.

■ At the outset section 615 of the Tariff Act of 1922 (19 USCA § 525) governs the burden of proof in such suit. In other words, "probable cause," or "reasonable cause" (U. S. v. One Bag [C. C. A.] 256 F. 301), having been shown by the record, for the institution of the suit, the burden of proof, or the necessity for an explanation, rests upon a claimant. The Luminary, 8 Wheat. (21 U. S.) 407, 5 L. Ed. 647; The Mistinguette (C. C. A.) 27 F.(2d) 738, at page 741.

The record of the trial seems to indicate that the sole witness examined was a member of the crew of the Coast Guard Cuyahoga, and I find no record of the introduction in evidence of the deposition of the master of the schooner. However, as it apparently has been made a part of the papers now submitted, it has been examined by me.

■ In substance it appears from the record that the George and Earl is a British schooner, with auxiliary engines, about 125 feet long, and, at the time in question, she was loaded with a quantity of intoxicating liquors, approximately 4,000 cases, of the foreign value of $33,200. It is also shown that she had no manifest, and, bearing in mind the circumstances of this case and the failure of the claimant to explain, on the trial, the situation, the fair inference is that this cargo was so under the control of the master of the schooner that he could do with it as he pleased. U. S. v. 416 Cases (C. C. A.) 27 F.(2d) 738, at page 741.

The officer of the Coast Guard boat testified that, when he was "7½ miles off the Long Island coast, the George and Earl was in sight of us about 4½ miles off." The weather was hazy and visibility poor. About that time it was seen that the schooner was heading south east-southeasterly; that is, away from the Long Island shore. The officer then took soundings, which he says showed 17 fathoms of water, and, having decided in which direction the schooner was going, changed his course, so as to head the schooner off. The schooner changed its course a little more to the east, and this sort of maneuvering continued until the Coast Guard boat overtook the schooner, which stopped after the Coast Guard boat had blown its horn. This witness states he was "sure he was still inside the 12-mile limit"; that is, he was 9½ miles off shore, but no one went aboard the schooner, except the chief bo's'n mate. The master of the schooner was then told that he could return with the Coast Guard boat under his own power, or that the Coast Guard boat would tow him in. The master accepted the latter, and the schooner was towed into

the port of New York. They arrived at the Barge Office about 8 o'clock, the schooner having been towed since 4:40 in the afternoon of the day previous. The speed they had made was about 4½ miles, and the distance covered, according to the officer, 87 miles.

The whole fact about this seizure, as to where it occurred, etc., is not based with exactitude in the usual manner, but, on the contrary, is a matter of "dead reckoning," which is a rather poor method to rely on at any time, and especially when the limitation on the right to seize requires reasonable exactness. Lecky, Practical Navigation (20th Ed.) p. 183.

Moreover, by the use of dividers and chart and taking the testimony of the officer of the Coast Guard boat, it appears possible, as claimed by the proctor for the claimant, that the schooner was outside of the 12-mile limit when she was seized. This argument of the proctor for claimant at least is as good a guess as that of the officer of the Coast Guard, who admits that his positive statements of position are after all a matter of a guess, based on soundings, distance of travel, speed, etc., rather than on other means usually employed where a location becomes important.

However this may be, there was no demand to see any manifest at the time of seizure. The officer of the Coast Guard testified that this was deferred until they had reached the harbor of New York; that he then for the first time went on board the schooner. It is a fair assumption that the bo's'n had promptly reported to the Coast Guard the nature of the cargo on board the schooner, else there was no reason given to hold her at all at the time of seizure, wherever she was.

■ It was a part of the government's prima facie case to prove by facts, or fair inference therefrom, pursuant to said section 584, that the schooner was "bound to the United States." The Mistinguette (C. C. A.) 27 F. (2d) 738. I have already indicated a case where such a reasonable inference seems to me to be present. U. S. v. The Newton Bay (D. C.) 30 F.(2d) 444, decided this day.

■ The facts in the present case are entirely dissimilar. Here the schooner George and Earl was not at rest, but was proceeding, at the nearest point testified to, almost 2 miles beyond the 3-mile limit. She was then heading *away* from the Long Island shore, rather than toward it. Her subsequent course also was toward the open sea. It may very well be that this schooner, finding herself nearer the territorial waters than she desired to be, was proceeding to go (not being chased) beyond the 12-mile limit, where there could be no doubt about her right to avoid even inspection. I am unable, however, to find by a fair preponderance of evidence, or by a fair inference from the facts, that the government has shown that this schooner, so sailing, was bound to the United States. On the contrary, there is nothing to rebut the inference that can equally be fairly drawn that she was not so bound.

The above distinguishes this case from the case of U. S. v. 63 Kegs (C. C. A.) 27 F.(2d) 741. In the latter case facts were found that "it is as probable that she intended to lie outside that limit [3 miles] and discharge into contact boats as that she intended to go within it." No such inference seems possible here.

■ Unless I can find that the vessel was so bound to the United States, there was no right to board her and seize her for not producing a manifest. She did not become bound to the United States, because she was subsequently towed there by a Coast Guard boat. I am not unmindful of the suspicious circumstances that always arise from a cargo of rum near our shores; but suspicion is not proof, and to forfeit a vessel or cargo under our laws requires proof of some sort which indicates at least a probable cause for the suit.

The whole truth of the matter seems to me to be shown by this officer of the Coast Guard, and the government's sole witness, when he testifies, in substance, that he was out to get rum runners (a fact for which he should receive due credit), and that when he saw this schooner through the haze "we decided she was a rum runner and started to head her off." He was not thinking of a manifest, or anything else, except that here was a schooner that looked like a rum runner, and so he seized her. This accounts for his failure to then do more than seize her and tow her into port.

The original libel has been mentioned for the fact that apparently the government first intended to rely on other reasons for forfeiture, but, because of the clear location of the schooner, these other reasons for forfeiture were abandoned. The Pictonian (C. C. A.) 20 F.(2d) 353.

■ It was not unlawful for this schooner to be sailing with a cargo of liquor outside the territorial jurisdiction of the United States. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306; The Pictonian, supra. There is

444

no evidence here of any contact with the shore, so far as this schooner is concerned, nor any attempt to unlade, or that she was even by fair inference prepared or preparing to unlade. She was simply sailing along and in a direction away from the shore.

In my opinion, therefore, the government has failed to prove a prima facie case for forfeiture. On the contrary, if I should find on this subject, I should be inclined to find that this schooner was not bound for the United States in accordance with the definition, and was not apprehended until she was outside the 12-mile limit. In the absence of other necessary proof, she was within her right in sailing outside territorial jurisdiction, although within the 12-mile limit covered by the Tariff Act.

The libel must therefore be dismissed.