## MENEFEE v. ADERHOLD, Warden.
### No. 194.

District Court, N. D. Georgia.
Nov. 10, 1932.

Gus Menefee, in pro. per.

Clint W. Hager, U. S. Atty., of Atlanta, Ga., for respondent.

UNDERWOOD, District Judge.

Petitioner, on the 1st day of October, 1918, a few weeks prior to the Armistice, was tried at Brest, France, by a general court-martial for the murder, on September 22, 1918, of Michael Gapinski, while on U. S. S. Fanning, off the coast of France.

Petitioner was fireman, second class, and Gapinski was water tender on said vessel.

The general court-martial was convened pursuant to order dated September 28, 1918, by Vice Admiral H. B. Wilson, Commander, Patrol Force, United States Atlantic Fleet. The order provided that the court should be composed of the following members: Capt. Horace W. Harrison, United States Navy (retired); Commander Clarence M. Stone, United States Navy (retired); Commander Adolphus Staton, United States Navy; Lieutenant Commander Robert M. Foyle, Junior, United States Navy; Lieutenant Commander George Joerns, United States Navy (retired); Lieutenant Commander Robert E. Tod, United States Naval Reserve Force; Lieut. Charles A. Macgowan, United States Navy; Lieut. John J. Twomey, United States Navy; Lieut. James T. Strimple, Medical Corps, United States Naval Reserve Force.

The order further provided that "no other officers can be detailed without injury to the service."

The court convened at 10 o'clock a. m. on October 1, 1918, with the following members present: Capt. Horace W. Harrison, United States Navy (retired); Commander Clarence M. Stone, United States Navy (retired); Lieutenant Commander George Joerns, United States Navy (retired); Lieutenant Commander Robert E. Tod, United States Naval Reserve Force; Lieut. Charles A. Macgowan, United States Navy; Lieut. John J. Twomey, United States Navy; and Lieut. James T. Strimple, Medical Corps, United States Naval Reserve Force, members; and Ensign Capers G. Barr, United States Naval Reserve Force, Judge Advocate.

Commander Staton was not present when the court was organized, but, at the afternoon session of the court, explained his absence by saying that notice of his appointment as a member of the court had been received by him only a few minutes previous to his appearance. (Record, p. 10.) He was excused from further attendance, and never served as a member of the court.

The record thus shows that only seven of the appointees and the Judge Advocate actually served as members of the court, and that of these three were officers on the retired list; two and the Judge Advocate were officers of the Naval Reserve Force; one was an officer of the Medical Corps, United States Naval Reserves; and only two were active officers of the regular service.

There was nothing in the record of the proceedings of the court-martial to show that any of the retired or reserve force officers were assigned to active duty, nor was any evidence of this fact presented at the trial in this proceeding, though this was one of the issues in the case.

A copy of the charges and specifications was served on petitioner the day before the trial, and counsel then appointed to represent him.

Petitioner was tried, found guilty of murder, and on October 3, 1918, sentenced by the court, two-thirds of the members concurring, "to be shot to death by musketry."

The proceedings, finding, and sentence were approved on October 12, 1918, by the authority convening the court, Admiral Wilson, and the record was referred to the "Secretary of the Navy, for transmission to the

President, and for such further action as may be deemed necessary in the premises."

The record, with Admiral Wilson's approval, was by him transmitted, on October 19, 1918, to "Secretary of Navy (Judge Advocate General) Bureau of Navigation, Washington, D. C."

The Judge Advocate General received the record and referred it, on November 26, 1918, with his opinion upholding the findings of the court-martial, to the Chief of the Bureau of Navigation. The Bureau, on March 15, 1919, concurred "in the endorsement of the Judge Advocate General," and recommended "approval of the proceedings, finding and sentence."

The record, with the accumulating opinions, indorsements, and approvals, was submitted to the Assistant Secretary of the Navy, and was acted upon by him as Acting Secretary of the Navy, on April 5, 1919. His action is shown by the following order, appearing in the record:

"Department of the Navy
"Washington

"26262—5400          5 April 1919.

"The foregoing recommendations of the Judge Advocate General concurred in by the Chief of the Bureau of Navigation are approved, but in view of all the circumstances of the case the sentence is mitigated to confinement for the period of his natural life and to suffer all of the other accessories of said sentence, as mitigated, as prescribed by Section 349, Naval Courts and Boards. The naval prison at the Navy Yard, Portsmouth, N. H. is designated as the place of confinement."

On April 7, 1919, petitioner was, pursuant to the above order, committed to the Naval Prison at Portsmouth, N. H. Paragraph 3 of the commitment, copy of which is attached to the response, provides: "3. The Department on 5 April, 1919, mitigated the sentence to confinement for the period of his natural life and to suffer all the other accessories of said sentence, as mitigated, as prescribed by section 349, Naval Courts and Boards. The Naval Prison at the Navy Yard, Portsmouth, N. H., was designated as the place of confinement."

By order of May 26, 1920, copy of which is attached to the response, the Secretary of the Navy ordered: "The Department Action of 5 April, 1919, designating the Naval Prison, Portsmouth, N. H., as the place of confinement in the case of the above-named man, is hereby modified in that the United States Penitentiary, Atlanta, Ga., is designated as the place of confinement."

Petitioner has been in confinement since his arrest on September 22, 1918, something over fourteen years. He filed his application for writ of habeas corpus in this court and was duly given a hearing. Having no lawyer, and it appearing that serious questions of law were involved, the court appointed an attorney to represent him, and continued the hearing to allow time for the preparation of the case.

The petition was amended, rehearing had, and briefs filed. As the case was finally presented, petitioner contended that the proceedings and sentence were void for the following reasons:

(1) The general court-martial was not constituted as required by law because nine officers were appointed and only seven served as members, and because, of the seven members who served, three were retired officers, not shown by the record or otherwise to have been assigned to active duty, and one was a noncombatant officer of the Medical Corps.

(2) The court had no jurisdiction over the offense, because it was not committed "without the territorial jurisdiction of the United States."

(3) The sentence of the court-martial was not approved by the President, as required by law.

Restrictions on the jurisdiction of courts-martial have been repeatedly emphasized by the United States Supreme Court, as will be seen from the following quotations:

"But, the court-martial being a special statutory tribunal, with limited powers, its judgment is open to collateral attack, and unless facts essential to sustain its jurisdiction appear, it must be held not to exist." Collins v. McDonald, 258 U. S. 416, 418, 42 S. Ct. 326, 327, 66 L. Ed. 692.

"To give effect to its sentences, it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with; and that its sentence was conformable to law. Dynes v. Hoover, 20 How. 65, 80 [15 L. Ed. 838]; Mills v. Martin, 19 Johns. [N. Y.] 33. There are no presumptions in its favor so far as these matters are concerned. As to them, the rule announced by Chief Justice Marshall in Brown v. Keene, 8 Pet. 112, 115 [8 L. Ed. 885], in respect to averments of jurisdiction in the courts of the United States, applies. His language is:

'The decisions of this court require that averment of jurisdiction shall be positive; that the declaration shall state expressly the facts on which jurisdiction depends. It is not sufficient that jurisdiction may be inferred argumentatively from its averments.' All this is equally true of the proceedings of courts-martial. Their authority is statutory, and the statute under which they proceed must be followed throughout. The facts necessary to show their jurisdiction, and that their sentences were conformable to law, must be stated positively; and it is not enough that they may be inferred argumentatively." Runkle v. United States, 122 U. S. 543, 556, 7 S. Ct. 1141, 1146, 30 L. Ed. 1167.

"Undoubtedly courts-martial are tribunals of special and limited jurisdiction whose judgments, so far as questions relating to their jurisdiction are concerned, are always open to collateral attack. True, also, is it that in consequence of the limited nature of the power of such courts the right to have exerted their jurisdiction, when called in question by collateral attack, will be held not to have existed unless it appears that the grounds which were necessary to justify the exertion of the assailed authority existed at the time of its exertion and therefore were or should have been a part of the record." Givens v. Zerbst, 255 U. S. 11, 19, 41 S. Ct. 227, 229, 65 L. Ed. 475.

Petitioner's first two grounds of objection to the court-martial proceedings will be only briefly referred to.

■ Petitioner should have raised the question set out in the first of these grounds at the court-martial trial, and, in my opinion, his failure to do so waived any objections he might have had to the personnel of the court. Bishop v. United States, 197 U. S. 334, 340, 25 S. Ct. 440, 49 L. Ed. 780. Indeed, the record shows that he went even further and expressly stated that he did not object to any member. (Record, p. 1.)

The second of the above grounds raises a more serious question, the determination of which depends upon the construction given to the words "territorial jurisdiction" in the statute conferring jurisdiction in murder cases on courts-martial. The statute is as follows: "If any person belonging to any public vessel of the United States commits the crime of murder without the territorial jurisdiction thereof, he may be tried by court-martial and punished with death." 34 USCA § 1200, art. 6; R. S. § 1624, art. 6.

Petitioner contends that, inasmuch as the U. S. S. Fanning was a war vessel of the United States, it was United States territory as long as it was on the high seas and not within the territorial boundaries of another nation, and therefore the crime charged was not committed "without the territorial jurisdiction" of the United States, and the court-martial which tried the offense had no jurisdiction over the crime.

It is a well-recognized principle of international law that a public vessel or "merchant ship is a part of the territory of the country whose flag she flies. But this, as has been aptly observed, is a figure of speech, a metaphor. * * * The jurisdiction which it is intended to describe arises out of the nationality of the ship, as established by her domicile, registry and use of the flag, and partakes more of the characteristics of personal than of territorial sovereignty. * * * It is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign." Cunard S. S. Co. v. Mellon, 262 U. S. 100, 123, 43 S. Ct. 504, 507, 67 L. Ed. 894, 27 A. L. R. 1306.

It is a question, then, as to whether or not, under the strict rules of law hereinafter cited, covering the jurisdiction of courts-martial, a public ship, in the circumstances of this case, is such territory of the United States as comes within the term "territorial jurisdiction" as used in the statute above quoted.

However, finding, as I do, that petitioner is now detained under an unlawful sentence, as claimed in the third of the above grounds, it is not necessary in this case to decide this question.

I will proceed, therefore, to consider the case under the third ground of objection.

As above noted, the law is very exacting, and should be, where a person is to be deprived of the right, recognized for centuries, to trial by jury in the civil courts of his country, and demands the strictest compliance with its provisions before the right of life or liberty shall be taken from him by any other kind of procedure.

The law recognizes that in the stress and passion of war, or in the exaggerated ideas of professional exigencies, a military tribunal may not be as careful to preserve the rights of an accused as a civil court in a trial before a jury of his peers.

This danger and the wisdom of providing against it is illustrated by the argument of the Judge Advocate in this case, who said in its

presentation to the court-martial: "Now, if the Court please, has the accused in this case put himself within the rule of self-defense? In considering that question I will ask the court, in so far as the relations of the parties are concerned, to consider this case not from a rule as established in civil life, but as one under military discipline, because I believe that if this court in this case acquits the accused on the plea of self-defense, or even from the circumstances reduced the crime of murder to manslaughter, that this court will put its stamp of approval upon mutiny and against every rule of discipline in the Navy." (Record p. 49.)

I shall now pass to a consideration of the question as to whether or not the statutory regulations covering the proceedings were complied with.

▆ Article 53, § 1200, of title 34 of the United States Code, Annotated, provides how a court-martial sentence of death may be legally imposed. That article is as follows: "No sentence of a court-martial, extending to the loss of life, or to the dismissal of a commissioned or warrant officer, shall be carried into execution until confirmed by the President. All other sentences of a general court-martial may be carried into execution on confirmation of the commander of the fleet or officer ordering the court."

It has been frequently held that the approval of a sentence of death or dismissal of an officer must be the personal act of the President. As noted above, the sentence in this case was not approved by the President, or even submitted to him for his approval, but was commuted by the Acting Secretary of the Navy.

▆ No statute authorized the Secretary of the Navy, or any other officer than the President, to commute a death sentence. On the other hand, the statutes expressly say they cannot.

"Every officer who is authorized to convene a general court-martial shall have power, on revision of its proceedings, to remit or mitigate, but not to commute, the sentence of any such court which he is authorized to approve or confirm. (R. S. § 1624, art. 54.)" 34 US CA § 1200, art. 54 (a).

"The Secretary of the Navy may set aside the proceedings or remit or mitigate, in whole or in part, the sentence imposed by any naval court-martial convened by his order or by that of any officer of the Navy or Marine Corps. (Feb. 16, 1909, c. 131, § 9, 35 Stat. 621.)" 34 USCA § 1200, art. 54 (b).

The Supreme Court, in Mullan v. United States, 212 U. S. 516, 521, 29 S. Ct. 330, 332, 53 L. Ed. 632, has differentiated between the commutation and the mitigation of a sentence:

"The court of claims was of opinion that this section did not apply to the action of the President of the United States. If it be conceded for this purpose that it is applicable to the President (§ 1624, arts. 38 and 53 of the Revised Statutes), we are of the opinion that the President's action did, in fact, mitigate the previous sentence of the court-martial as approved by the Secretary of the Navy. It may be conceded that there is a technical difference between the commutation of a sentence and the mitigation thereof. The first is a change of a punishment to which a person has been condemned into one less severe, substituting a less for a greater punishment by authority of law. To mitigate a sentence is to reduce or lessen the amount of the penalty or punishment. 1 Bouvier's Law Dict. 374; 2 Id. 428.

"When the President otherwise confirmed the sentence of the Navy Department from absolute discharge from the Navy to reduction in rank and duty for the period of five years on one-half sea pay, he did what in terms he undertook to do; and, by the lessening of the severe penalty of dismissal from the Navy, approved by the Department, reduced and diminished, and therefore mitigated, the sentence which he was authorized to approve and confirm against the appellant, or mitigate in his favor."

It would seem, therefore, that the sentence under which the petitioner is detained is void. The death sentence could not have been executed because never approved by the President, and the life sentence is void because the death sentence was not commuted by the President, and the attempt of the Acting Secretary of the Navy to do so was futile, even if we assume he had as complete power in the premises as the Secretary of the Navy might have had.

▆ The question remains as to what disposition should be made of petitioner in view of the finding that his present detention is unlawful. The only guidance the statute offers is that the court shall "dispose of the party as law and justice require." 28 USCA § 461. I interpret this as meaning a sound discretion in the light of all the facts and circumstances of the case. I have more than once read the entire record of the court-martial proceedings for aid in determining what will be lawful and just in this case.

██ I recognize that this court is not one of review, and that it has no jurisdiction to examine into the merits of the case for the purpose of determining whether or not a writ of habeas corpus should be sustained; but, on the other hand, I understand that the facts and circumstances may be taken into consideration, after it has been first determined that the detention is unlawful, for the purpose of deciding what disposition should be made of the petitioner. I will therefore set out a brief résumé of the facts disclosed by the record in the court-martial proceedings.

Petitioner had been in the Navy about eighteen months and on board the U. S. S. Fanning with Gapinski about fifteen months, before the shooting. All witnesses spoke well of petitioner, and the commanding officer of the vessel, Lieutenant Commander Cogswell, himself, testified that "the accused's general reputation was a quiet, hard-working fireman." (Record, p. 33.)

On the other hand, several officers and seamen testified that Gapinski, though a good water tender, was a brutal bully (Record, pp. 13 and 22), very overbearing toward those under him (Record, pp. 8, 18, 19, and 26), a man who was determined to have his way, and who often abused and struck those under him (Record, pp. 13, 21, 22 and 40). He was a large man, weighing 190 pounds (Record, pp. 7 and 16), while petitioner was a small man. On one occasion petitioner and others saw Gapinski attack another with such violence that he broke the victim's nose and arm (Record, p. 41), necessitating long hospital treatment. Petitioner testified that he was afraid of Gapinski and tried to stay away from him. On one occasion he asked to be transferred from the electrical gang in order that he could keep away from, and not have to work with, Gapinski, as testified to by the chief water tender and others. (Record, pp. 20 and 26.)

On the morning of the shooting, Gapinski cursed petitioner, and threatened him with serious bodily injury. This was established by several witnesses. Later on in the morning Gapinski cursed and threatened petitioner again for opening a hatch to get some fresh air. (Record, p. 35.) Thereafter petitioner, fearing for his life, got a pistol from the racks in the engineers' petty officer compartment, and put it in his pocket. He carried it the rest of the day. About 11 o'clock that night, after cleaning a burner, petitioner was regulating the steam when Gapinski called him. Petitioner went to Gapinski, noticing at the time that he had a large wrench in his hand. This was not customary and, according to the testimony of the chief water tender, "there is no necessity for the use of a wrench of that size in his line of duty. He might go down to clean burners himself, but a water tender on watch only used a six inch wrench." (Record, pp. 27 and 28.) The witness testified that, since there were firemen present, he would under no conditions have cleaned it personally. (Record, p. 28.)

According to petitioner (Record, p. 35), Gapinski asked him if the burner which he had just cleaned was clean. Petitioner replied that it was. Gapinski said that he "was a God damned liar," and petitioner replied that he was another. Whereupon Gapinski struck at petitioner with the wrench and badly injured his right wrist, with which petitioner tried to ward off the blow. At the same time petitioner, who was left-handed, drew the pistol and began shooting and backing the while from Gapinski, "who kept coming at" petitioner. (Record, p. 35.) All of petitioner's testimony was corroborated by the other witnesses except as to what took place immediately before the first shot, and as to all of that except as to whether Gapinski struck first with the wrench. The only witness present at that time was Albert Williams, fireman, second class. He was within a few feet of petitioner and Gapinski when the quarrel started, but did not see them at the moment the shooting began, as he had his back turned to them, but he heard the conversation between them, and corroborated petitioner's statement as to what was said. Williams said that at least three shots were fired before he could turn around (Record, p. 4); that then Gapinski was standing upright, still had the wrench in his hand, and was about three feet (Record, pp. 4 and 5) from petitioner, who was still firing.

After the shooting, Williams reported the occurrence to the officer of the deck, Lieut. John A. Vinson, who came down on the plates where petitioner was. (Record, p. 11.) Petitioner handed Lieut. Vinson the pistol, and asked him what to do. He was told to report on deck, and did so, reporting to the commanding officer, Lieut. Cogswell, the facts as above stated. (Record, p. 32.) Petitioner's injured wrist was examined by Lieutenant Commander Cogswell, and later dressed by the pharmacist.

██ From a careful study of the record of the court-martial, I believe the above is the truth of the case. Every part of the petitioner's testimony is fully corroborated by other witnesses, both officers and seamen, except, as above stated, the fact as to whether Gapinski

struck first with the wrench, and there was, on this point, no evidence to contradict petitioner's statement. There is, I think, at least a grave question as to whether the evidence was sufficient to establish petitioner's guilt beyond a reasonable doubt.

In these circumstances, then, what should be done with petitioner? He cannot be remanded to the court-martial which tried him, if that were called, since it adjourned and ceased to exist years ago and could not be reconvened.

It is possible that the sentence "to be shot to death by musketry" might still be validated by the approval of the President, but this would hardly seem just, even if lawful, after petitioner has served over fourteen years under an invalid sentence.

On the other hand, if the sentence be submitted to the President, and he should disapprove the findings, there is no court-martial to which it could be returned for trial.

I have reached the conclusion, therefore, on the facts as I see them, that petitioner has already suffered sufficiently for his offense, even if guilty, and that it will be "lawful and just" to order his discharge, which I have done. The discharge, however, will be delayed for sixty days from this date to allow time for an appeal, should respondent wish to take an appeal.